## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE S. ELGHOSSAIN and MONA C. ELGOSSAIN, Plaintiffs vs. BANK AUDI, S.A.L, BANQUE DU LIBAN, JOHN DOES 1-10 Defendants. | Civ. Action No. **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs George S. Elghossain and Mona C. Elghossain for their complaint against Defendants, allege as follows:

## INTRODUCTION

1.      Plaintiffs George S. Elghossain and Mona C. Elghossain are married United States citizens who deposited hard earned United States dollars ("USD") in Bank Audi, SAL, ("Bank Audi") only to be preyed upon by the Ponzi scheme that is the Lebanese banking system.

2.      Defendant Banque Du Liban ("BDL") is the central bank of Lebanon and the architect of the Ponzi scheme. In the 1990s, as Lebanon emerged from its devastating fifteen-year civil war, a dual currency system formed with the USD and Lebanese Pound or Lira ("LBP") both being used widely. The two currencies were not pegged, however, causing massive swings in the exchange rate and chaos in the Lebanese economy.

1

3.     BDL is a legal public entity enjoying financial and administrative autonomy. It is not subject to the administrative and management rules and controls applicable to the public sector. Its capital is totally appropriated by the State. The BDL is endowed by law, with the prerogatives to fulfill its mission.

4.     BDL is entrusted by law of holding Lebanon's gold reserves. The value of the gold reserves held by BDL was estimated at $13.9 billion by mid-August 2019.

5.     In an attempt to solve the problem, the then and current BDL Governor, Riad Salameh, engineered the pegging of the exchange rate at 1507.5 LBP per $1 USD. To support the artificial pegging of the exchange rate, BDL and the Lebanese government sought to encourage foreign currency investment, particularly USD, which became the dominant deposit currency in Lebanon.

6.     Most of the foreign currency transfers into Lebanon came from the Lebanese diaspora around the world.

7.     A pegged exchange rate to USD was the main reason behind the large foreign currency transfers into Lebanon.

8.     Lebanon was one of few countries that had a surplus in its balance of payments regardless of a negative trade balance. Over the last two decades, the stability of the Lebanese economy depended on a pegged exchange rate.

9.     Beginning in 1992 through late 2020 BDL Governor touted a pegged rate of 1,507.5 LBP per $1 USD and repeated it enough times through the years that the slogan became BDL's trademark and the Lebanese Government unwritten policy.

10.     Depositors like Plaintiffs relied upon information presented by Lebanese banks including Bank Audi. However, an exchange rate pegged to the USD was the key factor in Plaintiffs' decision to convert their hard earned USD to LBP.

11.     Currently BDL Governor's stated position is that the peg will not be removed without an agreement with the IMF.

12.     Lebanese banks lured investments of USD with high interest rates, a pegged exchange rate, strong correspondent banking relationships in New York, and sophisticated banking services.

13.     The shareholders and executives of the commercial banks many of whom served in high levels of the government, supported by BDL's inflated financial statements portrayed the banking system as strong and flourishing, and they received rich distributions and salaries plus incentives/commissions based on volume of deposits they lure in.

14.     The Lebanese banks promoted and circulated financial information they knew to be false to induce existing and new clients to transfer and convert USD into LBP.

15.     In reality, the high interest rates that Lebanese commercial banks used to lure Plaintiffs were unsustainable and placed the commercial banks in jeopardy once new deposits dwindled and depositors sought to remove their USD from the commercial banks.

16.     BDL was also vulnerable as a result of the strain on the commercial banks which deposit USD with BDL to provide it with liquidity.

17.     By early 2015 Lebanese commercial banks and BDL began recognizing depleting USD deposits which strained the system as the commercial banks' interest obligations increased.

18.     BDL and the commercial banks needed to adjust their business model which would have revealed the false premise on which BDL engineered the banking system and the shareholders and executives of the commercial banks would have no longer been able to enrich themselves to same extent.

19.     Because BDL and the commercial banks were intent on keeping a cover over the growing problem so they could continue to enrich themselves notwithstanding the unsustainability of their policies, they did not alter their business model.

20.     Instead, BDL and the commercial banks agreed that they would engage in an illegal scheme to cover up and delay the self-created and looming crisis, all so that they could cover up their failed policies and continue enriching themselves.

21.     BDL and the commercial banks agreed they would offer even higher interests to lure new deposits and to induce depositors to retain their deposits in Lebanon knowing the commercial banks could never sustain the interest payments. BDL and the commercial banks agreed they would project strength and health for the Lebanese banking system they knew was facing an imminent liquidity crisis.

22.     The conspirators agreed to specifically target people of Lebanese descent living abroad, particularly United States citizens and residents.

23.     They agreed to use illegal means to carry out their conspiracy including by making fraudulent misrepresentations, omissions and theft all so the BDL executives and the bank's shareholders and executives could further enrich themselves at the expense of their victims which included depositors.

24.     At the same time BDL and its executives, the Lebanese banks and their executives were engaged in luring USD transfers into Lebanon their own deposits and investments were transferred and kept outside Lebanon.

25.     At least since 2016 BDL Governor began to apply alternative eccentric accounting practices which he promoted as "Financial Engineering" to cover-up BDL's losses.

4

26.     Lebanese commercial banks used the Association of Banks of Lebanon (ABL) to coordinate their scheme with each other and BDL and to communicate instructions for carrying out the scheme. The ABL may have once been a legitimate organization of the chief executives of the commercial banks in Lebanon, but the commercial banks including BDL started to use it as an instrumentality of their unlawful scheme.

27.     In furtherance of their scheme Lebanese commercial banks began offering extremely high interest rates to attract USD depositors both within Lebanon and abroad to feed the failing system and further their scheme. Upon inducing depositors to wire transfer their USD to Lebanon depositors were then induced to convert the USD into LBP in return for which the depositors were promised even higher and even more unsustainable rates.

28.     As the Lebanese commercial banks and BDL planned and as the depositors would soon learn the LBP was about to become highly devalued and nearly worthless.

29.     Once the depositors converted their USD into LBP they were left with no alternative other than a complete devaluation of the LBP deposits and to completely erase any of the remaining value held by these depositors.

30.     While BDL continued to deceptively advertise an "official" exchange rate of approximately 1,507.5 LBP per $1 USD the true exchange rate has been fluctuating between 3,900 to 10,452 LBP per $1 USD as of the date of this filling.

31.     For political reasons Lebanon currently operates under at least three different exchange rates. The official BDL posted rate of 1507.5 LBP per $1 USD never changed. An unofficial rate of LBP 3,900 per $1 USD is used by the banks in foreign currency transactions and for imports of essential goods and government subsidies of commodities most of which are smuggled to Syria in circumvention of the sanctions imposed by the Caesar Syrian Civilian

Protection Act of 2019 and a floating black market rate of close to LBP 10,452 at times.

32.    While depositors can only withdraw about $100 per week from their bank, money changers buy from bank an unlimited amount of USD at LBP 3,900 per $1 USD and sell it on the black market for anywhere between LBP 5,000 up to LBP 10,452.

33.    In November 2019 Lebanese commercial banks illegally adopted their own "unofficial" capital controls by restricting withdrawals and transfers of all currencies especially USD a currency black market suddenly emerged and continues to wreak havoc on the economy.

34.    While the Lebanese commercial banks emptied their ATMs and restricted dollar withdrawals the black market supported by the Lebanese commercial banks and allowed by BDL, money changers continue to exploit citizens while their money is misappropriated by Lebanese banks.

35.    In May 2020, a Lebanese Prosecutor charged the director of monetary operations at BDL, money changers, and a bank manager with "manipulating" the exchange rate and with money laundering.

36.    While Lebanon's commercial banks and those benefiting from their association with, and employment by were able to continue to hoard valuable USD while depositors who exchanged their USD into LBP were left with an almost worthless local Lebanese currency. As of the date of this filling the Lebanese currency (LBP) lost 85% of its value.

37.    When certain depositors like Plaintiffs wanted to convert their LBP deposits back into USD and exercise their right to transfer their hard earned deposits outside Lebanon, the Lebanese commercial banks and BDL conspired to prevent depositors from collecting deposits outside of Lebanon.

38.     The end result for victims of this enterprise is that while BDL and Lebanese commercial banks continue to hold USD in deposit within the Lebanese banking system the victims have no way to access their hard-earned USD anywhere in the world.

39.     BDL and the Lebanese commercial banks knew that the payment of the inflated interest rates was unsustainable and when the flood of new USD deposits waned, the Lebanese commercial banking system collapsed.

40.     The conspirators' scheme engineered the theft of tens of billions of dollars from over two and a half million people including thousands of United States citizens and residents.

41.     When the Lebanese commercial banks could not induce sufficient new deposits to pay their obligations, the banks hoarded the USD deposits of many of their depositors by lying to induce customers to retain their deposits. Ultimately, the banks refused lawful withdrawal requests from their depositors. At the same time, the Lebanese banks discriminatorily permitted politically connected depositors, bank executives, bank shareholders, and their relatives to offshore their USD which of course only exacerbated the self-inflicted liquidity crisis. The Ponzi scheme had collapsed, and BDL and the Lebanese banks resorted to outright theft of their depositors' USD.

42.     On July 23, 2020 Reuters reported that BDL's "*governor inflated assets as liabilities grew".*  The Reuters report stated that **"**The financial statements for 2018, a copy of which was seen by Reuters, were signed off with qualification by EY and Deloitte just last month [*June 2020, **emphasis added***], and have not been made public. The Lebanese media alleges that BDL used eccentric accounting practices (Financial Engineering) to increase its 2018 assets by $6 Billion.  The same accounting principles most likely apply to prior years.

43.     By mid-2019 The Lebanese commercial banks were actively colluding with BDL and using the ABL to institute unlawful, draconian, and discriminatory capital controls and restrictions on withdrawals and transfers of USD outside Lebanon.

44.     Lebanon's banking crisis has driven the Lebanese commercial banking system to place its own USD hoarding above the rule of law in flagrant violation of the rights of depositors and foreign investors' like Plaintiffs.

45.     At the same time Lebanese politicians, bank shareholders, executives, owners, and board members (many of whom are parliament members and former ministers of Lebanon's government), bank employees, BDL executives, and other influential people and companies were permitted by BDL and the Lebanese banks to safely offshore their USD. This self-destructive corruption exacerbated the liquidity crisis in the Lebanese banking system and is the subject of ongoing investigations and political unrest within Lebanon.

46.     On or around October 23, 2019 Reuters reported that Ex-PM Najib Mikati, his son Maher and his brother Raja in collusion with Bank Audi and enabled by BDL were making illicit gains through BDL subsidized housing loans. The affluent Mikati family was able to purchase government subsidized housing units allotted to moderate & low income residents. While the Prosecutor of Mount Lebanon filed charges and a judge was assigned, it appears that the matter was tabled. In a press release outside the court system Bank Audi later denied the charges.

47.     On October 17, 2019 the Lebanese government unceremoniously decided to impose a surcharge of ¢20 per day on users of WhatsApp, Facebook and Instagram.

48.     The announcement of such a surcharge was apparently the straw that broke the camel's back. Immediately thereafter, an uprising erupted when citizens of Lebanon took to the

streets to protest and express their anger and frustration over the country's corrupt regime.

49.     The uprising that had been hindered by the Covid-19 pandemic and suppressed by official and unofficial security forces is not yet subdued but continues to be unheeded.

50.     Lebanese Banks in unison with each other closed their doors within 2 days of the uprising under the pretext of wanting to prevent a bank run.

51.     The Lebanese banks did not reopen their doors until they had strengthened the unlawful draconian and discriminatory unofficial capital controls.

52.     Prior to the uprising a BDL recognized silent run on the banks began. The Elite, politically connected, bank executives, board members, and branch managers were alerted and transferred large dollar deposits out of Lebanon ahead of intended capital controls.

53.     Small businesses and ordinary depositors trusted and relied upon a pegged exchange rate and left dollar deposits in the banks until it was too late. With remittances drying up and depositors queuing up to withdraw cash, capital controls were inevitable. Now those dollar deposits are frozen and effectively worthless.

54.     As Lebanon faced its worst financial crisis since the early seventies and under pressure from Protesters, the Lebanese government had contracted the New York based consulting company **Alvarez & Marsal** to conduct a forensic audit of BDL's accounts.

55.     On or around November 20, 2020, Alvarez & Marsal unilaterally cancelled its contract with the Lebanese government because BDL refused to provide it with the required documents. The Governor claims that the bank secrecy laws of Lebanon would preclude him from doing so.

56.     The Alvarez contract was negotiated and approved by the same government it is supposed to audit.  The contract by its provisions was designed to be breached by either party. Experts agree that the forensic audit will never achieve any of its declared objectives.

57.     The Alvarez contract was negotiated and approved by the government that is supposed to audit.  The contract by its provisions was designed to be breached by either party.

58.     The Commerce Du Liban magazine reported in its October 8, 2020 issue that "BDL's accounts that are normally audited on an annual basis by the local offices of Deloitte and Ernst & Young do not provide a clear idea of the central bank's financial position.

59.     Since 2013 at least, BDL audits have been accompanied by qualified opinions which is unheard of for any central bank.

60.     Plaintiffs received and read with unease an investigational report dated December 10, 2020 and published by the Organized Crime and Corruption Reporting Project ( OCCRP) and its Lebanese partner Daraj entitled "Offshore Firm Tied To Lebanon Central Bank Governor Sold Stock to Bank He Regulates" which can be viewed at:

https://www.occrp.org/en/investigations/offshore-firm-tied-to-lebanon-central-bank-governor-sold-stock-to-bank-he-regulates

61.     Page 1 ¶ 3 of the report states "The transaction involved shares in Crossbridge Capital, a London wealth management firm, that were held by an obscure Panama-registered company, Crossland Assets Corp. Salameh's son, Nady, formerly worked for Crossbridge and retains shares in his old firm.

62.     Page 1 ¶ 1 of the report alleges that a  "company tied to Lebanon's central bank governor bought a stake in his son's company, then sold it to a major Lebanese bank that he regulates, OCCRP and Daraj.com have learned.

63.     Page 1 ¶ 4 of the report states "Bank Audi, Lebanon's largest bank, acquired the Crossland shares in 2016, as Riad Salameh was instituting a controversial monetary policy that benefited the bank to the tune of $1.6 billion."

64.     On what may be a related matter the Beirut office of the Associated Press (AP) reported on January 19, 2021 that the Swiss Office of Attorney General (OAG) opened a money laundering probe of Lebanon's central bank. The Associated Press article also stated that "The Swiss attorney general confirmed in a statement it had opened an investigation following media reports in Lebanon about it but no additional details were released. The office declined to provide further information on its inquiry."

65.     When Lebanon's leading prosecutor questioned BDL's Governor Riad Salameh at the request of the Swiss OAG the Lebanese prosecutor informed Salameh that he has a choice of being questioned in Lebanon or Switzerland with a promise of safe passage.

66.     It is incredible that the leading Lebanese Prosecutor did not see it fit to assert or obtain jurisdiction of the matter from the Swiss.

67.     Given a choice of venue, BDL Governor Riad Salameh availed himself of the Swiss jurisdiction rather than the Lebanese jurisdiction. He allegedly stated that he is willing to travel to Switzerland and submit to being questioned by the Swiss attorney general, and he will appoint a lawyer to follow up on the case.

68.     On February 8, 2021, George S. Elghossain contacted the Swiss Embassy in Washington DC by email and requested confirmation and additional information of the matter under the Swiss Freedom of Information Act (FOiA).

69.     In a follow up telephone conversation the "legal advisor" of the Swiss Embassy acknowledged the receipt of the email request and advised George S. Elghossain that they will check with their Government and reply.

11

70.     In a suspect but late attempt at the truth after over a year since the uprising the Lebanese prosecutor of Mount Lebanon (Ghada Aoun) charged Salameh with Dereliction of duties and abuse of trust. It remains to be seen whether the charges will be fully resolved.

71.     On March 5, 2020 Reuters (Beirut) reported that **"**Financial prosecutor Ali Ibrahim questioned bank chairmen this week over transfers abroad and recent sales of Eurobonds to foreign funds. Ibrahim issued an order …. **"**to freeze the assets of 20 Lebanese banks, their top bosses and boards because they were found to have allowed the capital flight of more than $2 billion dollars during one of the worst crisis in the country's history".

72.     The Financial prosecutor's Order was quickly overturned and the freeze suspended by the  higher authority of State Prosecutor - Ghassan Oueidat who declared that "Such a move would send the country as well as its monetary financial and economic sectors into chaos," notwithstanding the uprising and the plight and despair of the Lebanese citizens whose deposits are  misappropriated.

73.     As of the date of this filing Lebanon and its political regime, its monetary financial and economic sectors are in turmoil and still no serious attempts at reform.

**Defendant Bank Audi is Lebanon's "Too Big to Fail" bank.**

74.     Defendant Bank Audi, SAL is a Lebanon-based commercial bank and financial services company headquartered in Beirut, offering financial products and services in personal banking, business banking, private banking, treasury, and capital markets segments.

75.     Bank Audi grew from a small Lebanese bank to a large banking group with a very large footprint in the MENA region, Europe, and Turkey, https://www.bankaudigroup.com/group/home

76.     In Lebanon the group consists of Bank Audi, SAL, Audi Investment Bank, SAL, Audi Private Bank, SAL, SOLIFAC, SAL, in Europe the group consists of Banque Audi (Suisse) sa, and Bank Audi France sa, in the MENA region the group consists of Bank Audi SAL - Jordan Branches, Bank Audi sae (Egypt), Audi Capital (KSA) cjsc, (Saudi Arabia), Bank Audi (Qatar) LLC, Bank Audi sal - Abu Dhabi Representative Office, and Bank Audi sal - Iraq Branches, and in Turkey the group operates as Odea Bank A.Ş.

77.     Bank Audi has been reported to have a network of 203 branches and more than 500 ATMs, and worldwide correspondents in 29 cities around the world. As at End-September 2020, Bank Audi's private customers' deposits reached $ 26.5 billion, with shareholders' equity reaching $3.0 billion, and consolidated assets totaling $35.2 billion.

78.     Bank Audi was among the chief perpetrators of the Ponzi scheme designed by BDL. Bank Audi lured investments of USD with high interest rates, a pegged exchange rate, strong correspondent banking relationships in New York, an alleged solid financial position and sophisticated banking services including in New York.

79.     Plaintiffs' relationship with Bank Audi date back to early 1980s. Plaintiffs' had an account with Bank Audi's branch in New York City which was eventually reorganized as Interaudi Bank in 1983 and which is currently managed by one or two Audi family members.

80.     Plaintiffs' accounts are with Bank Audi's branch in Zahle, Lebanon. Currently managed by Mrs. Mona Doummar Charro ("Mrs. Charro").  For a long time Mrs. Charro was a neighbor and a friend of George S. Elghossain.

81.     Plaintiffs who are United States citizens of Lebanese descent travel to Lebanon occasionally on relatively short trips to visit family and friends and having a bank account in Lebanon was and still is convenient.

82.     Plaintiffs' longstanding investment strategy always had a short investment horizon and that automatically excluded investments in Lebanon.

83.     Plaintiffs inherited few parcels of valuable real estate from their respective parents, most of which were zoned industrial.

84.     In congruence with their investment strategy Plaintiffs sold about 90% of these parcels in USD and the proceeds were deposited in Plaintiffs' account with Bank Audi and almost immediately were transferred into their account in the United States.

85.     There was at least five separate wire transfers in USD from Bank Audi in Lebanon to Plaintiffs' bank accounts in the United States to the tune of $840,000.00.

86.     By contrast transfers from the United States to Lebanon were infrequent and insignificant, excluding the $400,000.00 transfer of October 22, 2018.

87.     Bank Audi as of the date of this filing had victimized Plaintiffs of around $650,000.00 USD in principal and accrued interest from Plaintiffs' accounts in Lebanon, which caused Plaintiffs hundreds of thousands of dollars in damages, loss of an offered business opportunity to acquire real property rental income and capital gains above and beyond the stolen deposits. In addition, under both applicable state and federal law and as described below, Plaintiffs are entitled to treble damages, legal and professional fees plus expenses.

88.     Bank Audi lured Plaintiffs in the United States via WhatsApp calls, photos and chats to lure him to wire transfer USD into their account in Lebanon and convert their USD into LBP deposits paying as high as fifteen percent (15%) interest rate with interest calculated and deposited monthly in a sight account which would be available on demand.

89.     Bank Audi lured Plaintiffs with a financially solid bank record, pegged exchange rate and high interest rates on Plaintiffs' LBP deposits converted from "Foreign Currency"

(USD) to induce Plaintiffs to make the deposits even though Bank Audi knew their scheme was unsustainable.

90.   To amass USD deposits and to effectuate USD transactions, including for Plaintiffs, Bank Audi maintains correspondent bank accounts in New York at large US banks.

91.   Bank Audi branch manager clearly understood from dealing with Plaintiffs that at all times Plaintiffs need the ability to readily transfer their USD from Lebanon to their accounts in the United States so they could conduct their business and execute potential real estate investments on fairly short notice.

92.   Plaintiffs had never before opened any LBP denominated accounts with Bank Audi or any other bank for that matter. Plaintiffs had not opened term deposit accounts with more than 30-day maturity with Bank Audi or any other bank for that matter.

93.   Plaintiffs' investment strategy did not include stocks, bonds or **foreign currency**.

94.   Plaintiffs are successful real estate investors. Plaintiffs own and manage income producing properties and have tailored their liquidity strategy to always have ready cash to allow them to capitalize on acquisition of additional real estate investments whenever an opportunity arises.

95.   Plaintiffs agreed with Bank Audi that any time deposits that Plaintiffs may approve must have a provision to terminate subject to no longer than a one-month notice.

96.   However, unsuspected by Plaintiffs, Bank Audi and other Lebanese commercial banks had collusively agreed to violate the rights of USD depositors by preventing the depositors from transferring their USD outside Lebanon.

97.   Bank Audi boasts a research department that is one of the best in the world. Bank Audi Research Department dates back to 1991 when the Bank first set up a fully-fledged

economic and banking database covering the different sectors of activity of the economy, subsequently launching its research activities.

98.     Bank Audi publishes annual, quarterly and weekly economic reports presenting the Bank's research with respect to the most recent economic developments in Lebanon and the region.

99.     Bank Audi intentionally concealed and misrepresented the hard facts about the Lebanese economy, BDL reserves, the dwindling volume of deposits, and the financial position of the bank. In addition to their own Bank Audi and BDL were at all times privy to all World Bank ("WB") and International Monetary Fund ("IMF") reports regarding Lebanon's deteriorating economy and impending financial crisis.

100.    Bank Audi knew or should have known that the 1) the Lebanese economy was in decline and 2) that a currency and financial crisis is looming when they lured Plaintiffs via WhatsApp to wire transfer their hard earned money to Lebanon and convert their USD to LBP.

101.    As of the date of this filing Plaintiffs had around $650,000.00 USD on deposit with Bank Audi.

102.    On or about September 1, 2018 Bank Audi launched a directed marketing campaign to promote what they termed as **"Product 705"** for "Foreign Currency" (USD) deposits to be converted to LBP. Plaintiffs received details and testimonials of the offering via WhatsApp calls, photos, and text chats.

103.    Bank Audi's branch manager called several times via WhatsApp to lure plaintiffs.

104.    Bank Audi never before solicited Plaintiffs for deposits by mail or telephone as they did in September and October of 2018.

105.    On October 22, 2018 George and Mona Elghossain instructed Coastal Federal Credit Union in Apex ("Coastal"), North Carolina to wire transfer $400,000.00 from their

savings account ending in 953 to their own current account with Bank Audi  ending in 0001.

106.   To make sure that the deposit gets done Bank Audi forwarded their wire instructions via email on October 22, 2018.

107.   Bank Audi lobbied & received USD transfers from Plaintiffs at a pegged exchange rate (LBP 1,513) and is obligated to return USD to Plaintiffs at the same exchange rate.

108.   The wire instructions designated Bank Audi's correspondent bank as JPMorgan Chase Bank (Chase) and account number 544729027.

109.   On October 29, 2018 Plaintiff George S. Elghossain traveled to Lebanon for business among which to open an LBP denominated account as per Bank Audi's **"Offering".**

110.   On November 1, 2018 Plaintiff visited Bank Audi's branch in Zahle and met with Mrs. Charro. As customary in Lebanon the meeting started with a cup of Lebanese coffee and a glass of water. After inquiring about family and mutual friends we delved into a conversation about the future of the Lebanese economy, the pegged exchange rate, and political climate. Mrs. Charro's outlook was positive on all fronts. Of course the conversation concluded with a short presentation on Bank Audi's and BDL's financial strengths.

111.   Mrs. Charro suggested that I pick up some printed media that was displayed right outside her office as well as visit the group's website. I picked up copies of Bank Audi's 2017 Annual Report plus few copies of Lebanon Weekly Magazine published by Bank Audi Research which was a trusted source for all economic and financial research.

112.   Mr. Antoine (Tony) Zeino an employee of the branch whom I had met on previous trips to the branch was asked by Mrs. Charro to start the paperwork for opening a 5-year term deposit based on Product # 705, to convert the $481,000.00 to LBP, ($400,000 (received by wire) and $81,000 from the current account ending in 0001) at an exchange rate of 1,513 LBP

per $1 USD. The term deposit ending in 0005 was opened with an LBP deposit of 726,253,000.00

113.   On October 9, 2019 Plaintiff George S. Elghossain decided to fly to Lebanon specifically to close the term deposit account, convert all LBP on deposit back into USD and initiate a wire transfer of USD to the United States. The exchange rate in October 2019 was LBP 1507.5 per 1 USD and remains unchanged as of the date of this filing.

114.   By mid-2019 news about Lebanon's liquidity crisis began to surface and eventually became common knowledge on social media.

115.   On October 9, 2019 Plaintiff George S. Elghossain decided to fly to Lebanon specifically to close all his accounts including his term deposit account, convert all LBP on deposit back into USD and initiate a wire transfer of USD to the United States. The exchange rate in October 2019 was LBP 1507.5 per $1 USD and remains unchanged as of the date of this filing.

116.   The term deposit ending in 0005 was opened with a deposit of LBP 726,253,000.00.

117.   Mr. Zeino also opened one sight account ending in 0004 with a deposit of LBP 1,500,000.00 and another sight account ending in 0006 with a USD deposit of $1,000.00.

118.   Among the documents that Mr. Zeino prepared and I signed was a "General Agreement for Opening and Activating Accounts and General Terms and Conditions for Electronic Banking Services" and a form document entitled "Term Deposit Account 705"

119.   The "Term Deposit Account 705" form indicates among other things the Account Currency is LBP, the Initial Currency is Foreign Currency and that the Closing Penalty is "The Penalty, in case applied is equivalent to a 1 month interest".

120.   I understood at the time that the interest earned by the term deposit would be calculated and deposited monthly in one of the two sight accounts and which by definition would be available on demand.

121.   On October 9, 2019 Plaintiff George S. Elghossain decided to fly to Lebanon specifically to close the term deposit account, convert all LBP on deposit back into USD and initiate a wire transfer of USD to the United States. The exchange rate in October 2019 was LBP 1507.5 per $1 USD and remains unchanged as of the date of this filing.

122.   On or about October 12, 2019 Plaintiff George S. Elghossain visited the Bank Audi branch and met with Mrs. Charro. While in Mrs. Charro's office, two bank clients walked in to talk to her in my presence.

123.    The first client whose identity was unknown to me wanted to withdraw ALL his USD deposits and stated that he does not want to convert his USD to LBP. The branch manager very tactfully ignored the client's request and instead proceeded to sell him on converting his USD into LBP and earn higher interest. The client was visibly upset and he repeated his request to close his accounts, however when his request was denied, he left upset and without any checks.

124.   The second client who walked into the office for the same reasons happens to be a relative of mine.  Unfortunately my relative was visibly angry and loud. He asked Mrs. Charro if his accounts were closed as he had requested multiple times and if his checks were ready. Mrs. Charro tried to calm him down. Finally she told him "NOT today, it is going to take a little while. He verbally expressed his frustration that Mrs. Charro is not complying with his instructions to close all his accounts.  He stood around looking confused and helpless.

125.   In retrospect, it is clear now that the run on the banks had already started well before the uprising and the Lebanese banks had already instituted their capital controls.

126.   At this time Mrs. Charro turned to me saying "I am sorry Mr. George, what can I do for you?"

127.    That was followed by a short chat about my trip and whether I was accompanied by my wife or other family members, and how long would I be staying in Lebanon?

128.   At this time I asked Mrs. Charro to (1) update and convert all LBP deposit into USD, and (2) close out all accounts and wire transfer all USD to my account in the United States.

129.   I also informed Mrs. Charro that I would like a copy of the actual written wire transfer details including a confirmation number as soon as the wire is completed.

130.   Mrs. Charro then informed me that Bank Audi was temporarily unable to wire transfer any USD outside Lebanon.

131.   I was unhappy and dismayed by Bank Audi's arbitrary and lopsided decision.

132.   At that point I requested a bank draft in USD drawn on any Bank Audi overseas subsidiary preferably any of its correspondent banks in New York City. Mrs. Charro indicated that Bank Audi would not approve that.

133.   Having witnessed the episodes of the 2 clients before me with utter confusion & shock I cringed in dismay realizing that there is nothing I could say or do that will change Bank Audi's illegal decision.

134.   In frustration and despair, I told Mrs. Charro to consider my instructions to close all accounts and wire transfer all my money to my account in the United States as a standing instruction. Mrs. Charro acknowledged my request and wished me a safe trip back home.

135.   Before I left the branch I was able to make a withdrawal from one of my sight accounts of 500,000.00 LBP.

136.   On the night of October 17, 2019 I was on my way from Zahle to Beirut airport to catch a flight back home. The drive that normally takes one hour, took my driver a little over three hours to complete. During the drive, I sadly witnessed the beginning of an uprising.

137.   I saw men and women protesters blocking the roads at every intersection with burning tires. I heard young men and women scream in anger and frustration condemning their government that wanted to impose a usage fee of 20 cents per day on WhatsApp, Instagram and Skype, of corruption.

138.   This entire trip to Lebanon was very upsetting and over fifteen months later I am still disheartened by it.

139.   Bank Audi branch manger's representations to Plaintiffs that Plaintiffs would be able to transfer their USD outside Lebanon were knowingly deceitful and false when made.  Bank Audi had no intention of permitting Plaintiffs or any other client to transfer their USD outside Lebanon. Rather, the bank was stalling while it unlawfully misappropriated Plaintiffs' USD.

140.   The Lebanese commercial banks including Bank Audi had no grounds for refusing depositors' instructions to transfer USD outside Lebanon. BDL and the banks entered into a conspiracy in which they agreed to make fraudulent misrepresentations to their depositors.

141.   Ultimately, after weeks and months of Plaintiffs repeatedly and desperately pleading for Bank Audi to follow Plaintiffs' binding instructions to execute a wire transfer or issue a foreign draft of Plaintiffs' deposits in Lebanon, it became very clear to Plaintiffs that Bank Audi simply did NOT want to return Plaintiffs' hard earned money.

142.   Knowing that Plaintiffs were desperately trying to salvage their real estate investments in the United States, Bank Audi with billions of USD around the world, steadfastly refused Plaintiffs' repeated demands for withdrawal of their deposits.

143.   Bank Audi pervasively used the wires and mails to carry out their fraudulent scheme to steal from Plaintiffs who are United States citizens.

144.   Plaintiffs suffered substantial injury in the United States as a result of Bank Audi's unlawful activity and corrupt conspiracy, including the loss of Plaintiffs' USD on deposit with Bank Audi, the loss of hundreds of thousands of dollars in the United States from a loss of a business opportunity to acquire real estate properties offered by Pulte Home Company, a loss due to Bank Audi's unlawful conduct of which Bank Audi were made keenly aware.

145.   Bank Audi's conspiracy was a commercial activity, comprised of BDL's purported repayment of debts it owed Bank Audi, and the obligations those banks owed to Plaintiffs as their retail clients.

146.   Bank Audi is liable to Plaintiffs under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., as a result of their commission of wire fraud and mail fraud to further their conspiracy to misappropriate Plaintiffs' USD and perpetuate their Ponzi scheme.

147. Bank Audi is also liable to Plaintiffs under state law for knowingly and intentionally refusing to close his accounts and wire transfer their funds to Plaintiffs' account in the US, all in furtherance of their conspiracy to defraud Plaintiffs, misappropriate Plaintiffs' USD, and perpetuate their Ponzi scheme.

148.  The fact that Lebanon's central bank would conspire with Lebanon's commercial banks including Bank Audi to commit wire fraud and mail fraud in the United States in order

to defraud United States Citizens who deposited their hard earned USD in Lebanon in order for the Lebanese banking system to hoard USD, demonstrates not only the depth of the banking crisis in Lebanon, but the utter collapse of the rule of law in Lebanon.

149.   Examples of a hijacked judiciary system by the Lebanese corrupt regime including Hezbollah are abound.

150.   Therefore, Plaintiffs, as United States citizens suffering injury in the United States from unlawful conduct Defendants directed into the United States, come to this Court seeking compensation for their injuries caused by Defendants' flagrantly unlawful conduct, and exemplary damages to punish Defendants for their illicit conspiracy to misappropriate USD from Plaintiff.

151.   The total compensatory and exemplary damages Plaintiffs seek in this action would probably exceed $3,000,000.00 USD.

## PARTIES

152.   Plaintiff George S. Elghossain is a citizen of the United States and the State of North Carolina, where he is domiciled. George S. Elghossain resides at 2203 Henniker Street, Apex, NC 27523-9514.

153.   Plaintiff Mona C. Elghossain is a citizen of the United States and the State of North Carolina, where she is domiciled. Mona C. Elghossain resides at 2203 Henniker Street, Apex, NC 27523.

154.   George S. Elghossain and Mona C. Elghossain are both of Lebanese decent and have been married for forty-four years.

155.   Defendant Bank Audi, SAL is a Lebanese bank with its headquarters located in the Bank Audi Plaza, Bab Idriss, and P.O. Box 1-2560 Riad El-Solh Beirut, Lebanon.

156.     Defendant Banque Du Liban (BDL) is the central bank of Lebanon. BDL is a legal public entity established by the Lebanese Code of Money and Credit promulgated on August 1, 1963 by Decree No. 13513. BDL's operations as the central bank of Lebanon commenced April 1, 1964. BDL is headquartered at Masraf Lubnan Street, 1100-5544, Beirut, Lebanon.

157.     JOHN DOE'S 1-5, as Employees of Bank Audi, SAL, each sued individually and in their official capacities as employees of defendants Bank Audi, SAL,

158.     JOHN DOE'S 6-10 as Employees of Banque Du Liban, each sued individually and in their official capacities as employees of defendants of Banque Du Liban,

159.     Plaintiffs will amend this complaint to recognize and substitute the names of any John Does when they are identified.

## JURISDICTION AND VENUE

160.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert causes of action pursuant to 18 U.S.C. § 1962, such that this action arises under the laws of the United States.

161.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a), because the action is against BDL, BDL is a foreign state within the meaning of 28 U.S.C. § 1603(a) and (b), and BDL is not entitled to sovereign immunity in this action, including pursuant to 28 U.S.C. § 1605(a).

162.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental subject matter jurisdiction over all other claims not arising under the laws of the United States.

163.     The Court would separately also have subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because Plaintiffs are citizens of the State of North Carolina and Defendant is a citizens of a foreign state, and the amount in controversy exceeds

$75,000, exclusive of interest and costs.

164.   The Court has personal jurisdiction over Bank Audi pursuant to New York CPLR § 301 and the United States Constitution, because Bank Audi regularly and systematically conduct business in New York and avail themselves of New York.

165.   The Court has personal jurisdiction over Bank Audi pursuant to New York CPLR § 302(a)(1) and the United States Constitution, because the causes of action set forth herein arise from Bank Audi's transaction of business in New York.

166.   This Court has personal jurisdiction over BDL pursuant to 28 U.S.C. § 1330(b), because Plaintiffs will serve BDL pursuant to 28 U.S.C. § 1608.

167.   Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claims herein occurred in this District. In the alternative, venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(3), because Bank Audi is subject to personal jurisdiction in this District.

168.   European Courts that presided over similar cases ruled that they have personal jurisdiction and allowed their dual citizens to prosecute Lebanese banks..

169.   BDL's Governor, Riad Salameh who is currently under investigation by the Swiss Office of Attorney General for money laundering decided to submit to the Swiss Jurisdiction rather that the Lebanese Jurisdiction.

170.   The Judiciary in Lebanon lacks independence and the readiness of the political system to interfere is real and a valid concern.

171.   The newly formed Lebanese Depositors' Union is currently exploring competent European and/or American jurisdictions to prosecute Lebanese banks because the Lebanese judiciary failed to uphold the law.

<u>**FACTUAL BACKGROUND FOR ALL CAUSES OF ACTION**</u>

**Plaintiffs' Banking Relationship with Bank Audi.**

172.    Plaintiffs are engaged in a variety of businesses and investments in the United States.

173.    George S. Elghossain is the founder/owner of GME Enterprises, Inc. a Sub-chapter S. Corporation ("GME").

174.    GME owns and manages several multifamily rental properties as well as several commercial properties one of which is slated for student housing development in the city of New Brunswick, NJ.

175.    George S. Elghossain has been a licensed real estate broker and real estate instructor in New Jersey from 1985 through 2017.

176.    George S. Elghossain owns and operates a real estate brokerage firm licensed in the state of North Carolina as Phoenix Realty Group which is a trade name of Phoenicia Investments of NC, L.L.C.

177.    George S. Elghossain is currently a licensed real estate instructor in the state of North Carolina where he plans to launch and operate a real estate school as soon as practical.

178.    The Lebanese banks including Bank Audi were actively targeting successful business people like George S. Elghossain who are of Lebanese descent.

179.    Bank Audi recently sought to convince investors like Plaintiffs to deposit USDs in the bank by promising high interest rates and representing to Plaintiffs that their USD would be safe and assuring depositors that they could readily transfer their USD outside Lebanon.

180.    The Lebanese banks, including Bank Audi were anxiously pursuing USD deposits because investment in Lebanon was waning and the banks were under pressure to meet previous

obligations to pay interest and an overall strain on their USD deposits.

181.    In particular the Lebanese banks including Bank Audi incentivized the deposit of USD by offering interest rates that exceeded the interest rates offered in other large banking markets, offered even higher rates for LBP deposits that were converted from foreign currency.

182.    However, as Plaintiffs repeatedly informed Bank Audi liquidity was critical for them as they would need to withdraw the USD they were depositing in Lebanon for deployment in their ongoing real estate investment projects in the United States on relatively short notice. LBP deposits must be in a timely manner readily convertible into USD to be considered liquid assets. Plaintiffs opened 30-day term deposits with Bank Audi to ensure liquidity.

**Plaintiffs' Deposits with Bank Audi**

183.    Bank Audi ranks number one of the roughly fifty-five banks that currently operate in Lebanon in terms of total assets.

184.    Bank Audi was founded in 1830 and incorporated in its present form in 1962 as a private joint stock company with limited liability (Société Anonyme Libanaise) with a duration of 99 years. Bank Audi was registered under number "11347" with the Page 48 of 610 Page ID #: 4821 Commercial Registry of Beirut and registered under number "56" on the list of banks licensed by the Central Bank of Lebanon.

185.    Bank Audi maintains correspondent bank accounts in New York at JPMorgan Chase Bank, NA, The Bank of New York Mellon, and Standard Chartered Bank. Bank Audi utilized JPMorgan Chase Bank, NA, throughout its relationship with Plaintiffs including to accept Plaintiffs' USD deposits.

186.    In 2016 Bank Audi Branch Manager explained to George S. Elghossain that in order for him to continue his banking relationship and maintain his accounts with Bank Audi, Plaintiffs must

comply with the Foreign Account Tax Compliance Act ("FATCA") and complete and sign W9 forms and FATCA forms.  George S. Elghossain informed the staff that he of course would report his funds as they are already reported in the United States and would be reported on the yearly Reports of Foreign Bank and Financial Accounts ("FBAR") Plaintiffs would file annually. Plaintiffs advised Bank Audi that Plaintiffs are in compliance.

187.    By 2016, Lebanese banks including Bank Audi were experiencing and witnessing pressure on their USD deposits. The high interest rates the banks had offered for years to induce deposits were catching up with the Lebanese banking system.

188.    By 2016 BDL Governor decided to employ what he called "Financial engineering" to allow him to disguise accrued losses.

189.    Bank Audi loaned most of their USD deposits to BDL to assist BDL in funding corrupt government enterprises.

190.    Bank Audi knew that the interest rates it was offering were unsustainable and placing its depositors' rights and property at risk as the problem worsened.

191.    Bank Audi lured George S. Elghossain who was an existing client because Bank Audi wanted George S. Elghossain to increase their USD deposits in Lebanon.

192.    In 2018, when Lebanese banks started precipitously inflating interest rates to attract more USD, Mrs. Charro reached out to George S. Elghossain on a personal note soliciting him to transfer USD and lured him by high interest rates and ready availability of their deposits.

193.    George S. Elghossain reminded Mrs. Charro that Plaintiffs are NOT interested in depositing large amounts of USD and mostly are NOT interested in converting their USD deposits into LBP.

194.    Mrs. Charro assured George S. Elghossain that despite a long term maturity their

deposits would be readily convertible and available anytime to transfer outside Lebanon to anywhere in the world.

195.  To induce Plaintiffs to deposit USD and to convert said deposits to LBP Bank Audi offered Plaintiffs high interest rates of 15% annually.

196.  In addition to inducing Plaintiffs to open accounts and deposit USD, Bank Audi assured Plaintiffs that if he were to open term deposit account in LBP with a five-year maturity period they would agree to break the contract upon a one month notice but with an early termination  penalty of one much interest.

197.  In addition, to induce Plaintiffs to open accounts and deposit USD, Bank Audi represented to Plaintiffs that as in the past there would be no restrictions on Plaintiffs withdrawing their USD and accrued interest or transferring their USD out of Lebanon.

198.  Based on past experience Plaintiffs trusted Bank Audi's representations to be true.

199.  At the time Mrs. Charro made these representations, she knew that there was a substantial likelihood the representations were false because she knew the strain on Bank Audi's USD deposits.

200.  The WhatsApp telephone call that George S. Elghossain received to introduce Bank Audi's offering of product "705" was part of a calling campaign to Bank Audi's existing clients in the Lebanese diaspora. Bank Audi further represented to Plaintiffs that it had many clients who were United States citizens and that Bank Audi regularly engaged in banking relations with these individuals residing in United States.

201.  Bank Audi further represented to Plaintiffs that as the number one bank in Lebanon with strong presence in the MENA region, Europe, and Turkey, Bank Audi was on very solid financial grounds.

202.    Bank Audi's representations that it would pay Plaintiffs substantial interest while still permitting Plaintiffs to readily terminate a time deposit contract and transfer their USD outside Lebanon were false. Bank Audi knew that due to the shortage of USD in the Lebanese banking system there was a substantial likelihood that Plaintiffs' rights to the large interest payments and transferability of their USD would be impaired.

203.    Based on these assertions, Plaintiffs uncharacteristically, agreed to open a 5-yearr term deposit account in LBP at Bank Audi.

204.    On October 22, 2018, Plaintiffs transferred $400,000.00 USD from George and Mona Elghossain's  savings account with Coastal Federal Credit Union in Apex, North Carolina to their Bank Audi account ending in  0001 in Lebanon.

205.    Bank Audi utilized its correspondent bank account in New York to accept the October 22, 2018 wire transfer.

206.   The aforementioned transfer by Plaintiffs from the United States was solicited by Bank Audi in furtherance of the scheme to induce deposits through the false representations of high interest rates and ready transferability of the depositors' USD.

207.    The banking relationship between Plaintiffs and Bank Audi was primarily conducted through phone calls, text messages, and emails.

208.    On November 1, 2018, and while physically present at Bank Audi's Zahle Branch, George S. Elghossain opened joint LBP accounts for Plaintiffs.

209.    Because Plaintiff Mona C. Elghossain was not in Lebanon at that time Bank Audi gave the account opening documents to George S. Elghossain to deliver to his wife in the United States for her signature.

210.    The account opening documents including an online use agreement, identified Plaintiffs as United States citizens residing in North Carolina. Thus, Bank Audi knew its misconduct against Plaintiffs was directed into the United States and North Carolina.

211.    On March 30, 2019 Plaintiff George S. Elghossain returned to Lebanon on business and delivered in person the Contract Agreement and Online Use Agreement signed by Plaintiff Mona C. Elghossain.

212.    It was during that trip that Plaintiff reiterated in person to Mrs. Charro that a real estate investment opportunity is being investigated and a Purchase Contract with the builder is probable and Plaintiffs would soon require the bank to wire transfer their USD into their bank account in the United States to secure said Contract. The much desired opportunity required Plaintiffs to fund a cash deposit and related closing costs.

213.    By August 2019 Plaintiffs were offered a real estate investment opportunity by Pulte Home Company in New Hill, North Carolina. The offer to acquire a certain number of newly constructed Townhomes in the anticipated Woodbury Community of New Hill was made soon after the buildup phase at introductory prices and incentives.

214.    As Plaintiffs had planned, and as they previously made Bank Audi aware of, Plaintiffs attempted to use their USD on deposit in Lebanon with Bank Audi to secure the New Hill investment.

215.     In August 2019 George S. Elghossain contacted Mrs. Charro and instructed her to wire transfer $500,000.00 to his account with Wells Fargo, N.A. ending in 8146.

216.    During August and September of 2019 Plaintiffs' reminded Mrs. Charro of the pending request for a wire transfer to make sure that Bank Audi anticipate it.

217.    It was customary for Plaintiffs to initiate Bank Audi wire transfers verbally over the telephone as long as Plaintiff made the request in person and not through an agent and follow up the verbal request with a signed letter.

218.    Mrs. Charro eventually George S. Elghossain that Bank Audi would not agree at that time to break the term deposit contract contrary to her representations at the time the term deposit was opened.

219.    At that time the banking crisis in Lebanon had already become acute, and Bank Audi was unlawfully hoarding USD. Also, Plaintiffs were not among the politically elite who Bank Audi and other Lebanese banks preferred and did allow to withdraw USD.

220.    Plaintiff's repeated requests for a wire transfer were not honored. As it surreptitiously planned along with almost all Lebanese banks, Bank Audi refused to follow Plaintiffs' instruction and did not execute the wire transfer as promised.

221.    Again, on October 9, 2019, George S. Elghossain flew to Lebanon to empress on Bank Audi in person the importance of transferring the USD to Plaintiffs' account in the US and the anticipated loss that Plaintiff's would incur if they are unable to secure the real estate properties that Plaintiffs had been offered by the builder.

222.    During the meeting, George S. Elghossain asked Mrs. Charro if Bank Audi was in a liquidity crisis or if any capital controls had been implemented by the Lebanese government. Mrs. Charro stated that there were no capital controls in place and no liquidity crisis.

223.    Mrs. Charro concealed from George S. Elghossain that Bank Audi was underhandedly and collusively blocking USD withdrawals and transfers by the elite.

224.    Throughout November 2019, Plaintiffs again advised Bank Audi that Plaintiffs would suffer substantial damages beyond the loss of their USD if Bank Audi continued to unlawfully misappropriate Plaintiffs' USD and refuse to follow their instructions.

225.    Plaintiffs did NOT consult US counsel regarding the Bank Audi matter. Plaintiffs personally further advised Bank Audi that its failure to wire Plaintiffs' their USD would result in an opportunity cost over and above the loss of their USD and interest.

226.    Bank Audi's unlawful misappropriation of Plaintiffs' USD was causing Plaintiffs severe prejudice, anxiety, and duress. Plaintiffs needed their USD to meet their investment objectives for pending real estate acquisitions. Bank Audi's callous disregard for Plaintiffs' rights made Plaintiffs desperate for access to their own USD.

227.    Bank Audi's refusal to execute wire transfers for Plaintiffs was motivated by and part of Bank Audi's fraudulent USD hoarding and misappropriation conspiracy.

228.    The burgeoning economic and financial problems fueled Bank Audi's need for cash, so, true to the nature of a Ponzi scheme, the Lebanese banks, including Bank Audi, sought new victims to lure in order to create income for the scheme.

229.    Bank Audi, had always represented to George S. Elghossain that Plaintiffs could readily withdraw or transfer their USD outside Lebanon.

230.    Plaintiffs relied on these repeated representations and were induced to convert their USD deposits into LBP with Bank Audi.

231.    Bank Audi knew, including based on account opening documents such as FATCA disclosures, W9 forms and KYC forms that Plaintiffs were United States citizens residing in North Carolina, and Bank Audi knew it was directing wire communications and mail communications into the United States.

232.    Bank Audi used its correspondent bank account in New York to transfer Plaintiffs deposits from Lebanon and to accept Plaintiffs $400,000.00 USD transfer on October 22, 2018.

233.    Throughout the discussions between George S. Elghossain and Mrs. Charro, George S. Elghossain made clear to Mrs. Charro and Mrs. Charro understood that Plaintiffs required ready currency convertibility and transferability of their USD outside Lebanon.

234.    These representations were false and known to be false when made by Mrs. Charro on behalf of Bank Audi to induce Plaintiffs to retain their USD in Lebanon and Bank Audi in particular.

235.    Around October 25, 2019, George S. Elghossain asked Mrs. Charro whether the rumors of wire transfers outside of Lebanon being prohibited were true. Via WhatsApp Mrs. Charro represented to George S. Elghossain while George S. Elghossain was in the United States that there was nothing even close to such a prohibition, because banks cannot stop people from withdrawing their funds. George S. Elghossain then asked Mrs. Charro if there were any capital controls. Mrs. Charro represented via WhatsApp to George S. Elghossain that there were no capital controls whatsoever and the rumors were not true.

236.    George S. Elghossain restated to Mrs. Charro that the wire transfer was required promptly so that he could use it to satisfy his deposit obligations for their intended acquisition of several real estate properties in New Hill, North Carolina.

237.    Mrs. Charro concealed from Plaintiffs the facts that Bank Audi had already collusively enacted informal capital controls by only allowing politically connected depositors to transfer their USD outside Lebanon for safekeeping while agreeing to prohibit withdrawals and transfers outside Lebanon by depositors without political connections.

238.    In reality, Mrs. Charro was acting in furtherance of Bank Audi's extensive conspiracy to hoard the USD in Lebanon by misappropriating USD from their depositors.

239.    Mrs. Charro confirmed to George S. Elghossain during their October 2019 meeting, that Bank Audi would execute the requested wire transfer in November 2019. Mrs. Charro's representation was knowingly false when she made it to George S. Elghossain. Mrs. Charro knew Bank Audi had already agreed not to permit withdrawals or transfers outside Lebanon by depositors like Plaintiffs who were not among the political elite.

240.    Bank Audi never executed the wire transfer despite its repeated assurances that it would.

241.    Plaintiffs further repeated to Bank Audi that Plaintiffs had committed to fund a large deposit upon signing a contract to acquire a real estate investment in the Woodbury Community project in New Hill, NC.

242.    Plaintiff's advised Bank Audi repeatedly that its continued misappropriation of Plaintiffs' USD was impeding the execution of the offered real estate deal to their detriment.

243.    Around June 2020 Mrs. Charro had called Plaintiff George S. Elghossain by WhatsApp to offer to break his LBP term deposit account and issue him an LBP denominated check that can only be negotiated in Lebanon for a 3-year term.

244.    Such a proposal was contrary to what Plaintiffs were promised by Bank Audi and more importantly too late to allow Plaintiffs to take advantage of the offer that they had to acquire the Woodbury Community properties.

245.    Under said proposal Plaintiffs would at the time incurred a loss of 30% of their deposits without getting access to it, while Bank Audi would have gotten rid of 15% interest and would have kept plaintiffs' USD.

246.    Plaintiff's counter was to ask Bank Audi for all his deposits including earned interest to be paid immediately by a USD bank draft on a US bank where Bank Audi has a lot of

cash or cash equivalent assets.  Mrs. Charro stated in response that Bank Audi will never "do that".

## FIRST CAUSE OF ACTION

### (Civil Conspiracy against Bank Audi)

247.    Plaintiffs repeat and incorporate by reference paragraphs 1 through 245 above as if fully set forth and realleged herein.

248.    From 1980 until 2019, Plaintiffs deposited USD into Bank Audi.

249.    In September 2019, Plaintiffs needed to withdraw the momey they had on deposit in Lebanon in USD to fund a real estate investment opportunity they were offered in New Hill, North Carolina.

250.    When Plaintiffs attempted to wire transfer their USD from their bank accounts in Lebanon to the United States, however, they were confronted by the conspiracy within the Lebanese banking system to hoard USD by intentionally misleading their depositors and misappropriating their depositors' USD.

251.    Bank Audi had agreed to unlawfully refuse to allow Plaintiffs and certain other USD depositors to transfer their USD outside Lebanon and to instead misappropriate Plaintiffs' USD for their own use to the exclusion of Plaintiffs.

252.    Bank Audi had also agreed to make fraudulent misrepresentations to Plaintiffs to carry out their scheme of hoarding USD in Lebanon and misappropriating Plaintiffs' USD on deposit with Bank Audi.

253.    Bank Audi used wire communications, including emails, telephone calls, and text messages, to make fraudulent misrepresentations to Plaintiffs and United States financial institutions while Bank Audi misappropriated Plaintiffs' USD in Lebanon.

254.     Plaintiffs instructed Bank Audi to transfer their USD on deposit in Lebanon to their accounts in the United States. The bank was obligated to comply with Plaintiffs' lawful instructions.

255.     Bank Audi unlawfully refused to execute Plaintiffs' wire transfer instructions.

256.     Bank Audi falsely represented to Plaintiffs that they were unable to execute wire transfers when in fact Lebanese banks including Bank Audi,  was regularly transferring USD outside of Lebanon, including for influential Lebanese politicians, banks executives and shareholders, and other well-connected depositors.

257.     Contrary to their false representations, Bank Audi was not subject to any genuine capital controls or any purported legal prohibition against following the instructions of depositors like Plaintiffs to transfer the depositors' USD outside Lebanon. Regardless, capital controls, even if enacted in Lebanon, would not absolve Bank Audi of their liability in this action.

258.     Bank Audi representations that they could not follow Plaintiffs' lawful instructions and execute transfers of Plaintiffs' USD outside of Lebanon were false and known to be false when made by Bank Audi.

259.     The Lebanese commercial banks including Bank Audi as well as BDL agreed to defraud USD depositors by having the commercial banks including Bank Audi refuse to make USD wire transfers outside Lebanon. Instead offered to issue checks in highly devalued LBP that can only be deposited in Lebanon.

260.     The Lebanese commercial banks including Bank Audi are large creditors of BDL, having deposited billions of USD with the BDL.

261.     The goal of Bank Audi's conspiracy was fraudulently inducing USD deposits and later misappropriating certain depositors' USD so they could hoard USD in Lebanon, while

allowing influential depositors to transfer their USD outside Lebanon to safer markets as the Lebanese banking crisis took hold in 2019 and continued in 2020 and 2021.

262.    Plaintiffs therefore were unable to deploy their USD for the real estate investment opportunities to be secured at 2019 prices in New Hill, North Carolina,

263.    As a direct and proximate result of Bank Audi's unlawful activity, Plaintiffs lost the valuable real estate investment opportunities at 2019 prices.

264.    However, Bank Audi have refused to honor Plaintiffs' lawful instructions.

265.    Bank Audi conspired to fraudulently and unlawfully misappropriate Plaintiffs' USD and detain Plaintiffs' USD in Lebanon by refusing to wire transfer it outside Lebanon, which is enduring a massive, self-inflicted banking crisis where Plaintiffs' USD remain in peril.

266.    Bank Audi's conspiracy to misappropriate Plaintiffs' USD was pervasive, a scheme that has caused and continues to cause Plaintiffs desperation and defeat.

267.    Bank Audi's conspiracy is ongoing, and is practiced against Plaintiffs and other similarly situated depositors.

268.    Bank Audi agreed to form a conspiracy pursuant to which they would fraudulently misappropriate Plaintiffs' USD for their own use to Plaintiffs' exclusion through their repeated fraudulent misrepresentations, fraudulent concealment, wire fraud, mail fraud.

269.    BDL agreed to participate in the conspiracy as a commercial actor, including in the context of its role as a debtor of Bank Audi and in participating in the commercial relationship between Plaintiffs and those banks. In addition, BDL has publicly and repeatedly stated that the funds of depositors of Lebanese banks were safe and that Lebanon had not instituted any capital controls such that BDL cannot possibly claim it was carrying out monetary policy FAILED to Plaintiffs for the purpose of Bank Audi's misappropriating Plaintiffs' USD. Thus, BDL cannot

avoid the consequences of its agreement to and participation in the conspiracy under the Foreign Sovereign Immunity Act, 28 U.S.C. § 1602, *et seq*. inflated financial statements concealing huge losses and vulnerability

270.    The pattern of unlawful activity in which Bank Audi engaged is strikingly demonstrated through Bank Audi's consistent and coordinated execution of their fraud across their respective financial institutions as will become evident below.

271.    Bank Audi have stolen from Plaintiffs around $650,000.00 USD in principal and accrued interest Plaintiffs had on deposit with Bank Audi, and interest continues to accrue.

272.    In addition, Bank Audi's conspiracy has caused Plaintiffs substantial damages to their business due to Bank Audi's conspiracy to fraudulently misappropriate Plaintiffs' USD which the conspirators knew was to be imminently invested by Plaintiffs in highly valuable real estate investments Plaintiffs had contracted for  but lost because of Bank Audi s' theft.

273.    To carry out their brazen conspiracy, Bank Audi directed their unlawful activity into the United States, injuring United States citizens, and violating the United States wire fraud and mail fraud statutes.

274.    As a result of their conspiracy, Bank Audi is liable for the damages suffered by Plaintiffs and the causes of action asserted by Plaintiffs in this action to recover their damages.

## SECOND CAUSE OF ACTION

### (Fraud against Bank Audi)

275.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 274 above as if fully repeated and set forth herein.

276.    Plaintiffs are clients of Bank Audi.

277.     Bank Audi, fraudulently induced Plaintiffs to transfer and deposit their USD with the bank, using the false representations of high interest rates that were not paid (only accrued "on paper"), pegged exchange rate and ready access to their USD through transfers outside Lebanon.

278.     At all times, Bank Audi represented to Plaintiffs that their deposits were safe and could be freely withdrawn and transferred outside Lebanon so that Plaintiffs could satisfy their funding obligations for their business activities. in accordance with their business plan.

279.     The Lebanese banking system was stressed as depositors sought to withdraw USD and transfer USD out of Lebanon for fear of a run on the banks.

280.     Bank Audi fraudulently induced Plaintiffs to deposit their USD in Lebanon by falsely representing to Plaintiffs that they would pay high interest rates and Plaintiffs could readily withdraw or transfer their USD outside Lebanon.

281.     By the end of 2020, Plaintiffs had around $650,000.00 USD on deposit with Bank Audi.

282.     Plaintiffs needed to transfer their USD from Lebanon to the United States in order to meet their funding obligations for real estate investments they wanted to acquire in North Carolina.

283.     Plaintiffs expressly and repeatedly advised Bank Audi that Plaintiffs needed to transfer their USD from Lebanon to the United States in order to meet their funding obligations real estate investments they planned to acquire in North Carolina.

284.     In the weeks and months that followed Plaintiffs' requests to transfer their USD from Lebanon to the United States, the Lebanese banking crisis was reaching a tipping point. Bank Audi and other Lebanese banks responded by permitting connected politicians, bank

shareholders and executives and other influential depositors to transfer their USD out of Lebanon while blocking most depositors through a variety of fraudulent and flagrantly unlawful measures.

285.  Unbeknownst to Plaintiffs, Bank Audi were part of a conspiracy to hoard USD to prevent depositors like Plaintiffs from withdrawing USD or transferring USD outside Lebanon.

286.  Plaintiffs gave instructions in person followed by telephone to Bank Audi, to execute wire transfers of Plaintiffs' USD to Plaintiffs' accounts in the United States.

287.  Bank Audi repeatedly represented to Plaintiffs that they had sufficient funds to and would execute the wire transfers as instructed by Plaintiffs.

288.  These repeated representations by Bank Audi were false and known to be false by Bank Audi when made.

289.  Plaintiffs relied on these representations to continue expending resources on the real estate acquisitions they secured in the United States, as Plaintiffs concurrently advised Bank Audi.

290.  After misleading Plaintiffs for months with affirmative misrepresentations about their ability and intentions to follow the lawful instructions from Plaintiffs in order to buy time and attempt to gain leverage over Plaintiffs, Bank Audi, finally revealed to Plaintiffs they would not be executing the wire transfers.

291.  However, Bank Audi's representations to Plaintiffs that they could not execute the wire transfers were false.  Nothing prohibited Bank Audi from honoring Plaintiffs' instructions and executing the long overdue wire transfers, except Bank Audi's conspiracy to hoard Plaintiffs' USD at Plaintiffs' expense.

292.    Bank Audi's lengthy and ongoing fraud against Plaintiffs caused Plaintiffs to lose the lucrative real estate acquisitions they had anticipated in the United States.

293.    Bank Audi's fraud has also deprived Plaintiffs of the USD they deposited with Bank Audi plus interest.

294.    As a direct and proximate result of Bank Audi's fraud, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Breach of Contract against Bank Audi)

295.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 294 above as if fully repeated and set forth herein.

296.    Plaintiffs and Bank Audi entered into an agreement pursuant to which Plaintiffs agreed to deposit USD with Bank Audi.

297.    Bank Audi agreed to pay Plaintiffs interest on their deposited USD.

298.    In addition, Bank Audi agreed that Plaintiffs could withdraw or transfer their USD (including accrued interest) from most of their accounts by providing instructions to Bank Audi and in the of one account by providing a one month notice..

299.    Plaintiffs complied with their obligations under the agreement.

300.    Plaintiffs repeatedly issued instructions to Bank Audi to transfer Plaintiffs' USD and accrued interest to Plaintiffs' account in the United States.

301.    In breach of the parties' agreement, Bank Audi failed and refused to comply with Plaintiffs' instructions.

302.    In fact, Bank Audi has in bad faith misappropriated all of Plaintiffs' USD and accrued interest.

303.    Bank Audi never mailed monthly bank statements and recently changed the online format to render their online statements meaningless, uninformative and without dates. They got rid of a summary of accounts they called Global Position. Plaintiffs are unable to reconcile their accounts.

304.    As a result of Bank Audi's breach, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but presently believed to be close to $3,000,000.00.

## **FOURTH CAUSE OF ACTION**

### **(Conversion against All Defendants)**

305.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 304 above as if fully repeated and set forth herein.

306.    Plaintiffs had on deposit specific, identifiable sums of money.

307.    Plaintiffs' deposits were fraudulently induced by Defendants Bank, Audi.

308.    Defendants issued worthless checks to Plaintiffs and misappropriated Plaintiffs' USD on deposit for their own use and to the exclusion of Plaintiffs.

309.    Plaintiffs had the right to possess and use their identifiable USD

310.    Defendants intended to deprive Plaintiffs of their identifiable USD.

311.    Defendants deprived Plaintiffs of their rights to use and possess their identifiable USD.

312.    As a direct and proximate result of Defendants' conversion of Plaintiffs' personal property, Plaintiffs have been damaged in an amount to be determined at trial but presently

believed to be around  $3,000,000.00.

## FIFTH CAUSE OF ACTION

### (In the alternative, Unjust Enrichment against Bank Audi)

313.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 312 above as if fully repeated and set forth herein.

314.     Bank Audi have been unjustly enriched by their misappropriation of Plaintiffs' USD, plus interest, at Plaintiffs' expense.

315.    It would be against equity and good conscience to permit Bank Audi to retain what they have misappropriated from Plaintiffs.

316.    As a direct and proximate result of Bank Audi's unjust enrichment, Plaintiffs have been damaged in an amount to be determined at trial but presently believed to be around $3,000,000.00.

## SIXTH CAUSE OF ACTION

### (In the alternative, Promissory Estoppel against Bank Audi)

317.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 316 above as if fully repeated and set forth herein.

318.    Bank Audi represented to Plaintiffs that Plaintiffs could freely withdraw their USD from their accounts or transfer their USD from their accounts to a bank accounts outside Lebanon.

319.    Plaintiffs reasonably relied upon Bank Audi's representations.

320.    Plaintiffs were unable to proceed with their real estate investments, they were

44

unable to arrange alternate financing on short notice, and other commercial activity, in detrimental reliance upon Bank Audi's representations.

321.    Bank Audi refused to honor their representations to Plaintiffs, and Bank Audi never allowed Plaintiffs to access their USD on deposit in Lebanon.

322.    In detrimental reliance on Bank Audi's misconduct, Plaintiffs have been damaged in an amount to be determined at trial but presently believed to be close to 3,000,000.00.

## SEVENTH  CAUSE OF ACTION

### (Violations of the Racketeer Influenced and Corrupt

### Organizations Act, 18 U.S.C. § 1962(c) against all Defendants)

323.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 322 above as if fully repeated and set forth herein.

324.    Bank Audi is part of an ongoing enterprise formed within the Lebanese banking system, which is comprised of commercial and retail Lebanese banks and BDL as the central bank.

325.    By early 2015, Lebanese banks began recognizing depleting USD deposits, which strained the system as the banks' interest obligations increased.

326.    BDL and the commercial banks including Bank Audi needed to adjust their business model, which would have revealed the false premise on which the BDL engineered the banking system and the shareholders and executives of the commercial banks including Bank Audi would have no longer been able to enrich themselves to same extent.

327.    Because BDL and the commercial banks including Bank Audi were intent on keeping a curtain over the growing problem so they could continue to enrich themselves

notwithstanding the unsustainability of their policies, they did not alter their business model.

328.    Instead, BDL and the commercial banks agreed that they would engage in an illegal scheme to cover up and delay the self-created and looming crisis, all so that they could cover up their failed policies and continue enriching themselves.

329.    BDL and the commercial banks including Bank Audi, agreed they would offer even higher interests to lure new deposits and to induce depositors to retain their deposits in Lebanon, knowing the banks could never sustain the interest payments. BDL and the commercial banks including Bank Audi agreed they would project strength and health for the Lebanese banking system they knew was facing an imminent liquidity crisis.

330.    The conspirators agreed to specifically target people of Lebanese descent living abroad, particularly United States citizens and residents.

331.    They agreed to use illegal means to carry out their conspiracy, including by making fraudulent misrepresentations and theft, all so the BDL executives and the shareholders and executives could further enrich themselves at the expense of their victims, which included depositors, borrowers and Lebanon.

332.    The commercial banks including Bank Audi used the Association of Banks to coordinate their scheme with each other and BDL and to communicate instructions for carrying out the scheme. The Association of Banks may have once been a legitimate organization of the chief executives of the commercial banks including Bank Audi in Lebanon, but the commercial banks including Bank Audi and BDL started to use it as an instrumentality of their unlawful scheme.

333.    In furtherance of their scheme, Lebanese banks began offering extremely high interest rates to attract USD depositors both within Lebanon and abroad to feed the failing system

and further their scheme. As BDL and the commercial banks including Bank Audi knew, the payment of the inflated interest rates was unsustainable, and when the flood of new USD deposits waned, the Lebanese banking system collapsed.

334.   The conspirators' scheme engineered the theft of tens of billions of dollars from over two and a half million people, including thousands of United States citizens and residents.

335.   The enterprise had and continues to have as its purpose, fraudulently retaining existing depositors and fraudulently inducing new depositors to make foreign currency deposits in Lebanon through, among other incentives, unsustainably-high interest rates, and retaining those foreign currency deposits. Existing and new deposits of USD currency were obtained in order to propagate the Ponzi scheme perpetuated by Lebanon's banks and to delay the inevitable consequence of the enterprise's financial engineering. BDL and Lebanon's commercial banks including Bank Audi systematically worked together to restrict and prohibit withdrawals of USD from Lebanese banks and restrict and prohibit USD transfers outside Lebanon.

336.   Upon inducing depositors to deposit their USD in Lebanon, it was a further goal of the enterprise to induce depositors to convert the USD into Lebanese LBP, in return for which the depositors were promised even higher (and even more unsustainable) interest rates. Once the depositors converted their USD to LBP, it was time for the participants of the enterprise and the engineers of the ongoing Ponzi scheme in the Lebanese banking system to bail themselves out. They were left with no alternative other than a complete devaluation of the LBP and to completely erase any of the remaining value held by these depositors.

337.   This is what we are witnessing now in the Lebanese financial crisis, as the "official" exchange rate is advertised by BDL to be approximately 1,507.50 LBP to $1 USD, whereas in reality, the actual exchange rate is fluctuating between 7,000 to 10,452 LBP per $1 USD.

338.    Thus, while Lebanon's commercial banks including Bank Audi (and those benefiting from their association with, and employment by, these banks) were able to continue to hoard valuable USD, depositors who exchanged their USD into LBP were left with an almost worthless local Lebanese currency.

339.    Nonetheless, victims of this enterprise that are still holding USD in deposit within the Lebanese banking system have no way to access their money without first converting to Lebanese LBP at highly discounted rates. Depositors have been left at the mercy of an enterprise that has deprived the innocent depositors of their hard-earned savings, with no alternatives for the depositors to access their money.

340.    Plaintiffs chose to keep part of their deposits in USD and earn far less interest even when they were offered lucrative interest rates by the Defendants to convert their USD to LBP.

341.    Since Bank Audi as a participant of the enterprise could not devalue the USD that the Plaintiffs held, Bank Audi took an alternative approach of offering to convert the USD into LBP at an artificially high exchange rate and close the account by giving the depositor a check in LBP that is negotiable only in Lebanon.

342.    In the period before the full picture of the Ponzi scheme run by Lebanon's banks began to emerge, the banks made generous distributions to their shareholders and executives, The banks actively sought to hide and delay the imminent banking crisis in Lebanon for as long as possible so they could continue to enrich themselves.

343.    Lebanon's commercial banks including Bank Audi accomplished the purpose of the enterprise by targeting, among others, U.S. citizens of Lebanese descent (such as Plaintiffs) to make foreign currency deposits and then persuading the depositors not to withdraw their money from Lebanon.

344.    Bank Audi made false statements about the interest that depositors could expect to earn from their deposits, as Bank Audi knew full well that the depositors were highly unlikely to recover the interest that would be earned on the deposits. Bank Audi also made false representations about the safety of the deposits and the transferability of USD outside of Lebanon. Bank Audi made these misrepresentations in order to induce new deposits and to retain existing deposits of USD.

345.    Lebanon's commercial banks including Bank Audi, benefited from the enterprise by prolonging their appearance as healthy financial institutions so that the shareholders and executives of the banks could continue reaping high but unwarranted compensation and distributions.

346.    BDL benefited from the enterprise by shielding the Ponzi scheme it had fostered from public view and attempting to delay the imminent collapse of the Lebanese banking system.

347.    While Lebanon's commercial banks including Bank Audi, promised unsustainably high interest rates to existing and new depositors, the banks purchased bonds from BDL, and in return for these investments, BDL promised to pay the commercial banks including Bank Audi interest rates that were even higher than those that the commercial banks promised to pay depositors like Plaintiffs.

348.    A debtor/creditor relationship existed between the commercial banks including Bank Audi who deposited money with, and purchased bonds from, BDL.  The commercial banks including Bank Audi that have deposits with BDL were aware of the imminent banking crisis in Lebanon. BDL Governor is alleged to be in questionable business  partnership with Bank Audi.

349.    BDL offered bonds to the Lebanese commercial banks including Bank Audi because BDL had insufficient liquidity to meet its financial obligations. As a result, BDL needed the commercial banks including Bank Audi to step in and provide the necessary liquidity which the banks obtained from depositors like Plaintiffs.

350.    By receiving high interest rates from BDL that were even higher than those the banks offered their depositors, BDL and the banks create the false appearance that the commercial banks including Bank Audi were profiting from their investment with BDL.

351.    In reality, Lebanon's commercial banks including Bank Audi were insolvent.

352.    BDL and the Lebanese commercial banks including Bank Audi formed a relationship to defraud existing and new depositors, like Plaintiffs. Their scheme was temporarily effective in luring and retaining tens of billions of deposits from unwitting depositors, thousands of which are residents and/or citizens of the United States, like Plaintiffs.

353.    The commercial banks including Bank Audi, are members of the Association of Banks in Lebanon (the "Association of Banks"). The Association of Banks consists of a group of commercial banks including Bank Audi, which are represented in the group by the banks' respective business leaders. The Association of Banks helped facilitate the scheme against foreign depositors, including Plaintiffs. While the Association of Banks may have had a legitimate purpose at the time of its inception, it ultimately became a mere vehicle for communicating instructions and coordinating plans for continuing Bank Audi's racketeering activities.

354.    The enterprise effectively transformed the Lebanese banking system into a Ponzi scheme. Like the Madoff scandal of 2008, it took a crisis—*i.e.*, the ongoing financial crisis in Lebanon's banking sector—to bring the full scope and intent of Bank Audi's scheme to light.

355.    At least as early as 2014, the heads of Lebanon's commercial banks including Bank Audi, as well as BDL were aware of the problems, and likely eventual collapse, caused by Ponzi scheme they were perpetrating. BDL and the commercial banks including Bank Audi, formed their RICO enterprise in or about early 2015 to hide the Ponzi scheme by delaying the collapse so that the BDL officials and commercial bank shareholders and executives could continue to enrich themselves.

356.    Defendants have participated in the operation and management of the enterprise, including by designing, directing, and executing transactions and strategies in furtherance of the purpose of the enterprise.

357.    The enterprise affects interstate commerce and foreign commerce.

358.    Defendants formed vehicles for the commission of multiple predicate acts of mail and wire fraud. The conduct of Bank Audi's enterprise is ongoing in nature, over an extended and ongoing period of time.

359.    Defendants conducted and participated in the enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c). Bank Audi have violated and continue to violate 18 U.S.C. § 1962(c) by being associated with the enterprise, which affects interstate and foreign commerce, and participating, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.

360.    Bank Audi, have committed wire fraud and mail fraud to further their scheme to misappropriate depositors' (including Plaintiffs ') USD and perpetuate their Ponzi scheme.

361.    An essential part of Defendant's scheme was to retain existing deposits and procure new depositors to maintain a flow of foreign currency, especially USD, into Lebanon. Mrs. Charro (Bank Audi's Branch Manager) reached out to George S. Elghossain in October of 2018

to solicit him to deposit USD with Bank Audi. In follow up communications between Plaintiff George S. Elghossain, and Mrs. Charro, Bank Audi falsely represented that Plaintiffs would earn substantial interest from their deposits while they would still be permitted to readily withdraw or transfer their USD outside of Lebanon.

362.    Mrs. Charro reached out to George S. Elghossain via an international WhatsApp call, during which Mrs. Charro pursued George S. Elghossain as an existing client to solicit him to deposit USD in Lebanon. In follow up communications, Mrs. Charro falsely represented that Plaintiffs would earn substantial interest from their deposits, as well as that they could readily withdraw or transfer their USD outside of Lebanon.

363.    Mrs. Charro falsely represented that Plaintiffs could withdraw or transfer their USD outside of Lebanon.

364.    In addition to soliciting Plaintiffs to deposit USD in Lebanon, Bank Audi repeatedly attempted to induce Plaintiffs into converting their deposited USD into LBP. That way, while Bank Audi would be able to have Plaintiffs' USD, Plaintiffs would be left with weak and unstable LBP, which Bank Audi knew to be almost entirely worthless.

365.    Given Bank Audi's promises of transferability of Plaintiffs' deposits outside of Lebanon, Bank Audi effectively emphasized to Plaintiffs that the bank maintained international correspondent banking relationships, including in the United States that would enable Bank Audi to transfer money outside of Lebanon for withdrawal and collection in the United States.

366.    Bank Audi was legally bound by its repeated promises and guarantees to Plaintiffs that Plaintiffs' deposits could be transferred out of Lebanon and collected in the United States.

367.    As part and parcel of their unlawful enterprise, Bank Audi used the same pattern of fraudulent and intentionally misleading representations. Bank Audi repeatedly assured Plaintiffs

that the bank and BDL were in good financial position, and that there would be no barriers to transferring Plaintiffs' deposits by wire transfer to the United States. Bank Audi however, had no intention of honoring Plaintiffs' wire transfer requests and allowing Plaintiffs' to withdraw their USD outside of Lebanon.

368.   In short, the coordination of unlawful activities by Bank Audi left Plaintiffs without any viable remedy. Plaintiffs could not withdraw their deposits outside of Lebanon and/or withdraw their deposits in Lebanon. Their only potential "option" was first to convert their USD into LBP and then  to transfer their funds to another Lebanese bank that was part of the scheme, and which like Bank Audi would not permit Plaintiffs to withdraw their deposits outside of Lebanon. Bank Audi reduced Plaintiffs' deposits of USD into meaningless numbers on their computer screens, with no ability by Plaintiffs to actually collect USD either in the U.S. or in Lebanon, which was the basis of Plaintiffs making the deposits in the first place.

369.   Moreover, to the extent depositors were convinced to convert their deposited USD into LBP, it was the aim of the enterprise to leave such depositors with nothing more than a nearly worthless local currency, while participants of the enterprise kept the USD for their own use.

370.   The multiple acts of mail and wire fraud in violation of 18 U.S.C. §.1341 that were in furtherance of Defendant's fraudulent schemes include:

a.   Using the United States email and/or telephone to fraudulently induce Plaintiffs into depositing USD into Bank Audi.;

b.   Using the United States email and/or telephone to make false and misleading communications intended to conceal, cover up and perpetuate Bank Audi's continuous racketeering activity; and

c.   Using the United States email and/or telephone to fraud in furtherance of their conspiracy

to defraud Plaintiffs and misappropriate in excess of $650,000.00 in principal and accrued interest from Plaintiffs' accounts.

371.    Bank Audi violated the federal wire fraud statute, 18 U.S.C. § 1343, because Bank Audi entered into a scheme to defraud Plaintiffs; Bank Audi actively participated in the scheme to defraud Plaintiffs; Bank Audi had the specific intent to defraud Plaintiffs; and Bank Audi have used and continue to use wires and mails in interstate and foreign commerce in furtherance of their scheme to defraud Plaintiffs.

372.    Given the purpose of the enterprise, and the worsening situation of the banking crisis in Lebanon, continual racketeering activity directed at United States victims is inevitable.

373.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are persons injured in their business and property by reason of Bank Audi's. RICO violations under 18 U.S.C. § 1962 as alleged herein.

374.    To date, Plaintiffs' deposits are still trapped in Lebanon, with no viable options for withdrawing Plaintiffs' USD outside of Lebanon. Plaintiffs' have been, and continue to be, harmed as a result of Bank Audi's deliberate failure and refusal to return Plaintiffs' USD.

375.    The enterprise's scheme continues to the date of this filing. Lebanon's commercial banks including Bank Audi now acknowledge that USD and LBP previously deposited into Lebanon cannot be withdrawn outside of Lebanon, which is precisely what Bank Audi have claimed about Plaintiffs' USD deposits. Nevertheless, Lebanon's commercial banks including Bank Audi continue to solicit depositors to make **fresh deposits** of **"new dollars"** into Lebanon under the pretense that these "new dollars" unlike prior deposits of ("old USD")   (like Plaintiffs'), can be transferred freely in and out of Lebanon. The banks' claims concerning the transferability of "new dollars" is false.

376.    Since the uprising and Bank Audi's illegal restrictions on withdrawals or transfers of USD, Plaintiffs who maintain large deposits with Bank Audi that the bank calls **"old dollars",** had to open yet another account ending in 0008 and make two separate wire transfers from the United States to insure that Plaintiff's sister who is a United States citizen and who resides in Lebanon received her monthly social security benefits in **"fresh dollars**.

377.    To date, while Plaintiffs' deposits are still trapped in Lebanon, with no viable options for withdrawing Plaintiffs' USD outside of Lebanon. Plaintiffs' have been, and continue to be, harmed as a result of Bank Audi's deliberate failure and refusal to return Plaintiffs' USD. Plaintiffs are forced to wire more of their hard earned money to conduct their personal business in Lebanon.

378.    Incredibly, despite the financial crisis roiling, Lebanon's banking sector and society at large, many of the major figures and leaders of Lebanon's banking system as well as the political system have not resigned or admitted fault, nor have they acknowledged the existence of the unseemly and illegal practices that have been carried out to perpetuate the fraud committed against Plaintiffs and many other depositors. The utter lack of acknowledgment and culpability suggests that the leaders of Lebanon's banking system, of which Bank Audi is a big part, are aware of the scope and nature of the enterprise's illegal activities, but that Lebanon's banks, including Bank Audi, continue to maintain the enterprise out of self-interest and a desire for self-enrichment.

379.    Plaintiffs are United States citizens and Bank Audi's unlawful activity injured Plaintiffs in the United States.

380.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to triple damages, reasonable attorneys' fees, and costs.

381.    As a result of Bank Audi's violations of 18 U.S.C. § 1962, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial, but trebled presently believed to be well in excess of $9,000,000.00.

## EIGHTH  CAUSE OF ACTION

### (Violations of the Racketeer Influenced and Corrupt Organizations

### Act, 18 U.S.C. § 1962(d) against All Defendants)

382.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 381 above as if fully repeated and set forth herein.

383.    Defendants have violated and continue to violate 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

384.    Defendants intended, and acted in coordination, to solicit foreign currency deposits into Lebanon with the goal of unlawfully keeping the deposits for Defendants's own use, and to leave depositors, including Plaintiffs, without any remedy to recover the foreign currency deposits.

385.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are persons injured in their business and property by reason of Defendants' RICO violations under 18 U.S.C. § 1962 as alleged herein.

386.    Plaintiffs are United States Citizens and Defendants' unlawful activity injured Plaintiffs in the United States.

387.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to triple damages, reasonable attorneys' fees, and costs.

388.    As a result of Defendant's violations of 18 U.S.C. § 1962, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial, but trebled presently

believed to be well in excess of $9,000,000.00.

## **JURY DEMAND**

**PLAINTIFFSS DEMAND A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE**

[Conclusion on following page]

## **CONCLUSION**

**WHEREFORE**, Plaintiffs pray for judgment in favor of Plaintiffs and against Bank Audi, jointly and severally, as follows:

A.    Compensatory damages;

B.    Prejudgment and post-judgment interest;

C.    Exemplary Damages, including triple damages pursuant to Plaintiffs' statutory causes of action, in an amount to be determined at trial;

D.    Total damages in an amount to be determined at trial but presently believed to be well in excess of $9,000,000.00.

E.    Attorneys' fees and costs;

F.    Such other and further relief as the Court deems just and appropriate.

Dated:        Apex, North Carolina,
              March 8, 2021

                                **GEORGE S. ELGOSSAIN**

                                By: /s/ *George Elghossain*
                                George S. Elghossain

                                **MONA C. ELGHOSSAIN**

                                By: /s/ *Mona Elghossain*
                                Mona C. Elghossain

                                2203 HENNIKER STREET
                                APEX, NORTH CAROLINA 27523-9514
                                Tel: (919) 904-1614
                                E-mail: elghossaingeorge@gmail.com

                                *Pro Se Plaintiffs*