# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE S. ELGHOSSAIN and MONA C. ELGHOSSAIN,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　　　　vs.<br><br>BANK AUDI, S.A.L, BANQUE DU LIBAN, JOHN DOES 1–10<br><br>　　　　　　　　　Defendants. | Civ. No. 1:21-cv-2162-PGG-BCM<br><br>Hon. Paul G. Gardephe |

## DECLARATION OF FADI MOGHAIZEL

I, Fadi Moghaizel, declare pursuant to 28 U.S.C. § 1746:

1. I am a Lebanese attorney, member of the Beirut Bar Association and senior partner of *Moghaizel Law Office*, a firm of 22 attorneys founded in 1953 and based in Beirut, Lebanon. My legal education covers a *License en droit* (law degree) from the Faculty of Law of Saint Joseph University, Beirut, in 1985, an LLM from the University of London in 1986, and a PhD from the University of London in 1991. I have been admitted to the Beirut Bar and started practicing in 1985. I was also admitted to the Paris Bar in 1992[1]. Since 1985, my main areas of practice include civil litigation, arbitration, contract law, banking law and financial contracts, and private international law.

2. My experience includes representing local and foreign clients before Lebanese courts (civil and commercial chambers), whether as plaintiffs, defendants, or intervening third parties in more than one thousand five hundred lawsuits, with more than seven hundred lawsuits in the area

---

[1] In 1994, I requested my omission from the Paris Bar for considerations linked to my French residency status.

1

of banking and finance law. My litigation experience covers all stages of litigation, and covers claims on the merits, attachments, injunctions, appeals to the Courts of Appeal and Cassation Court, as well as enforcement of deeds and judgments. I am in a position to say that I have acted before all types and degrees of Lebanese courts. I have also been advising clients for more than thirty five years in relation to issues of Lebanese contract law, banking law, including structuring, securing, and enforcing the settlement of banking facilities of all types, breach of contract, and validity of contracts. I have acted as counsel and arbitrator in institutional (ICSID, ICC, and several Arab arbitration centers) and *ad hoc* arbitration proceedings. I have also acted as an expert witness before foreign courts, including the High Court of Justice in London and courts in the United States of America, as well as before arbitral tribunals. My clients comprise individuals, legal entities, governmental entities, and foreign governments.

3. I submit this Declaration in support of *Bank Audi S.A.L.*'s (the 'Bank') motion to dismiss the complaint (the 'Complaint') of Mr. George Elghossain and Ms. Mona Elghossain (the 'Plaintiffs').

4. I am fluent in Arabic (bilingual proficiency), French (bilingual proficiency), and English (full professional proficiency), and for ease of the parties and the Court, I have prepared this Declaration in English.

5. For the purpose of this Declaration, I have reviewed scanned photocopies of the following documents:

    a. The Arabic version of the '*General Agreement for Opening and Activating Accounts and General Terms and Conditions of Electronic Banking Services*' executed by Plaintiffs and the Bank on or about July 19, 2014.

    b. The English version of the *'General Agreement for Opening and Activating Accounts*

*and General Terms and Conditions of Electronic Banking Services*' executed by Plaintiffs and the Bank on or about November 1, 2018 (each of the aforementioned agreements, the 'Agreement' and together the 'Agreements').

c. The Complaint.

6. My Declaration will cover the four following issues:

a. The jurisdiction of Lebanese courts.

b. Governing law.

c. The availability and ability of Lebanese courts to hear the Plaintiffs' claims.

d. International transfers.

**A. Jurisdiction of the Lebanese Courts**

7. The courts of Lebanon having exclusive jurisdiction to settle disputes brought by Plaintiffs against the Bank (arising out of the Agreements or the Plaintiffs' accounts with the Bank) have been expressly agreed by the parties in the Agreements.

8. The jurisdictional clause in the 2014 Agreement signed by Plaintiffs in Arabic that I reviewed reads as follows: '*The commercial court in Beirut has jurisdiction to look into any dispute that may arise out of the accounts, or related to them, or resulting from them. However, the Bank shall be entitled, whenever it wishes, to sue the client or his successors before any other courts in Lebanon or abroad*'.

9. The 2018 Agreement signed by Plaintiffs in English that I reviewed includes the following jurisdictional clause: '*Beirut courts shall have jurisdiction over any dispute that may arise of this Agreement and its annexes or of the Accounts of the Client or the other Account holders and all matters related to or resulting from the Accounts. However, the Bank shall be*

3

*entitled to take legal actions against the Client, the Cardholder, the Secondary User or their successors before any other courts in Lebanon or abroad.*[2]

10. Unilateral or asymmetrical jurisdictional clauses, such as in the Agreements between Plaintiffs and the Bank, are very common in banking and financial contracts, whereby the clients must sue the financial institution in the courts of a specified country, while the financial institution remains free to sue the clients in the jurisdiction of its choice. Such clauses are necessary to enable banks to bring actions against their customers or counterparties, in the event of default under the contractual obligations, in their home or any other competent jurisdictions.

11. In the matter at hand, the Plaintiffs have agreed that they may sue the Bank only in Lebanon, while the Bank may sue the Plaintiffs in Lebanon or in any other competent foreign jurisdiction.

12. Such choice of jurisdiction clauses is valid under Lebanese law. They are given full effect by Lebanese courts pursuant to the principle of the autonomy of the will.

13. It is on the basis of the aforementioned rule that the first paragraph of Article 221 of the Code of Obligations and Contracts ('COC') lays down the fundamental and compelling universal rule of the binding force of contracts by stating that '*Agreements that have been validly made are binding for the parties*'.

14. Plaintiffs and the Bank have the legal obligation to abide by the provisions of the Agreements, which include their consent that the courts of Beirut have exclusive jurisdiction to settle disputes arising out of the Agreements, save for the Bank's right to sue the Plaintiffs in other jurisdictions, as explained in paragraphs 8 to 12 above.

---

[2] Second and third sentences of Clause X of Chapter Six entitled '*Governing Laws and Competent Jurisdiction*'.

15. As explained above, as far as the Plaintiffs are concerned, the jurisdiction of the Beirut courts in this matter is exclusive, in view of the parties' agreement granting the right to sue abroad to the Bank only.

16. The rules governing the interpretation of contracts under Lebanese law confirms such position. Article 368 of the COC prescribes that: '*The clauses of the same agreement are construed and coordinated each by the others, in light of the deed as a whole*'. This confirms that the interpretation of Clause X of Chapter Six of the Agreement must be made in a coherent fashion by taking into consideration its wording as a whole. It is in that context that granting the right to the Bank only to sue before foreign courts means unequivocally that such right is not available to the Plaintiffs.

17. To sum up, Beirut courts have exclusive jurisdiction to settle disputes arising of the Agreements for actions brought by the Plaintiffs in accordance with the parties' express agreement and Lebanese law.

18. Not only Lebanese courts have exclusive jurisdiction as a matter of law, but they are at the same time the most appropriate courts to interpret and apply Lebanese law and assess the rights and obligations of the parties under such law and in light of the complex economic and financial crisis prevailing in Lebanon since October 2019.

**B.**     **Governing Law**

19. The parties have expressly agreed that their Agreements and relationships are governed by Lebanese law. The English language Agreement of November 1, 2018 signed by Plaintiffs reads as follows: '*Without prejudice to the Provisions of Paragraph 1 of Article 1 of Chapter Six of this Agreement, this Agreement shall be governed and construed in accordance*

*with Lebanese laws'*[3]. The equivalent clause in the 2014 Agreement signed by Plaintiffs in the Arabic language reads as follows: *'Without prejudice to the Provisions of Paragraph 1 of Article 1 of Chapter Six of the present Agreement, this Agreement is governed by the provisions of Lebanese law'*.

20. Here too, as with the jurisdiction clauses covered in the preceding section of this Declaration, it is by virtue of Articles 166, 176, and 221 of the COC, which embody the principles of contractual freedom and binding force of contracts, that the Plaintiffs and the Bank must abide by the provisions of the Agreements, which include their consent that the Agreements and the disputes arising out of them must be governed by Lebanese law.

21. For the sake of completeness, assuming that the Agreements had not specified the law governing the Agreements, Lebanese law would still apply under the Lebanese conflicts of law rules on the grounds that (i) the Agreements were signed in Beirut, (ii) the parties' main obligations are performed in Lebanon, and (iii) the parties domicile set out in the Agreements are located in Lebanon[4].

22. Based on the foregoing, it is Lebanese law that governs the present claim.

**C.**     **Availability and Ability of the Lebanese Courts to Hear Plaintiffs' Claims**

23. The Lebanese legal system follows the pattern of civil law legal systems. The Lebanese legal system is based on the predominance of codified bodies of laws, which comprise the Lebanese Constitution (1926), laws enacted by Parliament, governmental decrees, ministerial decisions, and orders and decisions issued by regulatory authorities.

---

[3] First sentence of Article X of Chapter Six entitled '*Governing Laws and Competent Jurisdiction*'. The provisions of paragraph 1 of Article 1 of Chapter Six of the Agreements records the client's approval of banking and electronic transactions having a foreign component in the event such transactions are subject to foreign law or practice, to agreements between the Bank and third parties, or to an international treaty signed by Lebanon. Such provisions are unrelated to the relationship between the client and the Bank that remain entirely and exclusively governed by Lebanese law.
[4] Emile Tyan, *Droit international privé*, pp. 283-286, Second edition, 1974 (in French).

24. The Preamble of the Lebanese Constitution provides that '*Lebanon is also a founding and active member of the United Nations Organization and abides by its covenants and by the Universal Declaration of Human Rights. The State shall embody these principles in all fields and areas without exception*'.

25. Article 7 of the Lebanese Constitution states that '*All Lebanese shall be equal before the law. They shall equally enjoy civil and political rights and shall be bound equally by public obligations and duties without any distinction*'.

26. Article 20 of the Constitution adds: '*Judicial power shall be exercised by courts of various degrees and jurisdictions. It shall function within the limits of an order established by the law and offering accordingly the necessary guarantees to judges and litigants. The law shall determine the conditions and limits of judicial guarantees. Judges shall be independent in the exercise of their tasks*'.

27. Article 1 of the Lebanese Code of Civil Procedure ('CCP') provides that '*The judiciary is a power independent from the other powers in the investigation and resolution of lawsuits, and such independence cannot be restricted by any limit which is not provided for in the Constitution*'.

28. Article 7, paragraph 3 of the CCP underlines that each person or corporate body, whether Lebanese or foreign, is entitled to file claims and defenses before Lebanese courts.

29. Lebanese courts have one of the oldest and richest legal traditions in the Middle East, that started in the late 1870s under the Ottoman Rule, and developed greatly under the French mandate from 1920 to 1943. Lebanese courts continued to be very productive since then, with the exception of forced intermittent interruptions during the Lebanese civil war, from 1975 to 1990. Lebanese courts have again been very active following the end of the Lebanese civil war in 1990,

and continued deciding cases in all areas of the law, including banking and financial law, benefitting also from the massive legislative and regulatory work that has been undertaken by Parliament since 1992. New laws and regulations were enacted in almost every area of activity, in order to modernize Lebanese legislation. The financial sector was one of the fields where legislative and regulatory activity has been intense over the last twenty-five years in order to keep up with international standards, laws, and regulations.

30. Lebanese courts are divided in three main branches: (i) courts that rule on civil, commercial and criminal matters; (ii) courts that decide on disputes between governmental authorities, on one side, and individuals and private corporate bodies and organizations, on the other side, and that are designated as administrative courts, and (iii) courts that address family law matters, and for some religious communities, inheritance and personal capacity matters, designated as religious communities' courts.

31. Although a civil law jurisdiction, while not bound by such decisions, it is a well-established rule that the courts follow the decisions of their higher courts.  For instance, the Court of Appeal usually follows the decisions as precedent of the Cassation Court, the highest civil court in the country, while the lower courts follow the decisions of the Court of Appeal. In the presence of well-established rulings laid down by the courts, judges often follow such rulings.  Clearly, all court decisions are not equal in value: the higher the court, the higher the authority; and therefore, decisions rendered by Courts of Appeal have more authority than the decisions of lower courts, and decisions of the highest civil court, the Cassation Court, have more authority than decisions of the Courts of Appeal and lower courts.

32. The civil unrest and financial crisis that broke out in Lebanon in fall 2019 did not materially disrupt the work of Lebanese courts. The courts continued their activity in a quasi-

8

normal fashion. As of March 2020, the Covid-19 crisis caused a certain degree of disruption depending on the evolution of the pandemic, especially in the Lebanese areas that were particularly affected. The Ministry of Justice and the High Council of Magistrates have managed to organize the work of Lebanese courts in a reasonably efficient manner, taking into consideration the difficult working conditions caused by the pandemic. Such measures enabled litigants to file lawsuits and pleadings, and courts have used and continue to use their best efforts to continue handling the cases submitted to them in an efficient manner.

33. On May 8, 2020 and August 19, 2020, laws were enacted to suspend statutory and contractual deadlines until December 31, 2020. Furthermore, on January 16, 2021, a law was enacted to suspend statutory and contractual deadlines during the full lockdown that was in effect in Lebanon. The last day of the lockdown was subject to debate because of the gradual lifting of the restrictive measures. That is why, on July 22, 2021, law no. 237 was published setting the last day of the suspension of deadlines to March 22, 2021.

34. The purpose of such laws is to prevent, *inter alia*, the lapsing of claims by time limitation, and to grant litigants the opportunity to organize their claims and defenses taking into consideration the difficulties that they might face due to the pandemic and other unforeseen and overwhelming events.

35. Since then, courts have resumed their activities without restrictions, whether due to the pandemic or other circumstances, and parties have free and full access to all courts in all Lebanese regions.

36. After the outbreak of civil unrest in the fall of 2019, and the financial crisis that followed, a significant number of Lebanese and foreign bank depositors who faced difficulties in transferring funds out of Lebanon filed lawsuits against Lebanese banks before Lebanese courts in

Beirut and several other Lebanese regions. Such lawsuits have been addressed timely and diligently by Lebanese courts, and such courts very often took a highly protective stance in favor of depositors to the extent that Lebanese judges have frequently been seen by the banks as acting discriminately in favor of depositors. In brief, I can assert that Lebanese courts would hold banks liable to their clients when claims made by such clients are meritorious.

37. To conclude on the issue discussed in this section, I would say that Plaintiffs have access to swift and efficient recourse in Lebanon and under Lebanese law. Certainly, as noted above, the courts of Lebanon are the most appropriate courts to interpret and apply Lebanese law affecting Lebanese citizens, banks, and other institutions across the nation of Lebanon in the midst of its financial crisis. In my opinion, the Lebanese judiciary can and indeed would render an appropriate judgment in this case.

**D.      International Transfers**

38. Under Lebanese law, the relationships between clients and banks are characterized as deposit and/or loan contracts. The rights and obligations of the parties arising from deposit and loan contracts in general are set out in Articles 690 to 718, and Articles 754 to 768 of the COC, with additional provisions specific to banks included in the Lebanese Code of Commerce. I should clarify here that the COC provisions governing deposits, that are applicable to bank deposits, are those relating to money and other fungibles, as opposed to those related to particular assets.

39. Under Articles 182 to 184 of the COC, a contract is made only once the offer is accepted by its recipient, in our case the Bank. This means that, under Lebanese law, (i) the Bank is bound by transfer instructions only once it has expressly agreed to perform the transfer in writing or has impliedly accepted such instructions by actually performing the transfer, and (ii) the bank is entitled not to accept transfer instructions.

10

40. Under *'the freedom of contract principle'* of Article 166 of the COC, transfer instructions must be accepted by the Bank to become binding. As long as the Bank has not expressly agreed to perform the international transfers, the Bank would not be bound to perform them and would not be liable for the Plaintiffs for not performing the transfers.

41. Lebanese law does not obligate the Bank to repay the funds standing on the credit of the Plaintiffs' account through an international wire transfer. Under Lebanese law, the Bank would validly discharge its obligation under Article 307 of the Lebanese Code of Commerce by handing the funds to the Plaintiffs in the form of a check drawn by the Bank on the Central Bank of Lebanon ('CBL') to the order of the Plaintiffs, or in any other repayment method chosen by the Bank and acknowledged by Lebanese law.

42. It is also important to underline that banks in Lebanon are currently in a situation that does not allow them to wire funds abroad freely due to a series of events and restrictions that I can summarize as follows:

a. While the country was already under serious economic stress, nationwide mass protests beginning on October 17, 2019 triggered what has become a severe financial crisis creating concern that in light of the prevailing panic, a rush by depositors to withdraw their funds deposited with the banks would provoke the collapse of the system and a loss of the depositors' funds. As a result, in order to safeguard the control of the situation, following the recommendation of the CBL, the regulatory authority of the country, the banks adopted certain restrictive measures regarding transfers abroad and payments in cash above a certain limit in foreign currency (generally USD 1,000 per week per customer). For point of clarity, the CBL, established by Decree-Law no. 13513 of August 1st, 1963 enacting the Lebanese Code of Money and Credit, is responsible for monetary

11

policy and bank supervision in Lebanon. That regulatory role is effected through CBL decisions, circulars, directives, and formal and/or informal communications addressed to the banks. Further, operating independently within the CBL is the Banking Control Commission of Lebanon (the "Commission"), established by law no. 28/67 of May 9, 1967, which works to control the banks' compliance with the various laws and regulations that are applicable to the banking sector. The Commission has the power to issue directives and recommendations to banks and impose corrective and remedial measures. Further, within the CBL is the Higher Banking Commission, established by Law no. 28/67, that has, among other powers, the authority to impose sanctions on banks in the event they violate legislative and regulatory prescriptions, including decisions of the CBL. Decisions of the Higher Banking Commission are final and not subject to appeal.  The CBL's authority, including the compliance authority of the Commission and the disciplinary authority of the Higher Banking Commission, is significant and can be compared to banking regulatory bodies in other countries, like that of the Federal Reserve in the United States.

b.  On November 17, 2019, the Association of Banks in Lebanon, which is comprised of all of the banks operating in Lebanon, adopted and announced to the public a resolution for a rule of conduct regarding the restrictions on transfers abroad or payments in cash in foreign currency. Local transfers (requested by customers in favor of accounts held at other Lebanese banks) and payments in foreign currency, including USD, remained and are still available at the present day.

c.  At the request of the government, the CBL did authorize, exceptionally, to use foreign currency funds held by the banks with their correspondents abroad to cover the

cost of basic important and necessary commodities for the benefit of the population, subsidized largely by the government, such as oil, gas, wheat and essential food products, in addition to basic medicines and medical supplies.[5]

d. In Intermediate Decision No. 13187 dated January 30, 2020, the CBL further mandated that the payment of the principal and interest of bonds and other financial instruments issued by Lebanese banks and deposited with a Lebanese custodian be made only at banks operating in Lebanon.

e. Thereafter, liquidity concerns became yet more acute when, in early March 2020, Lebanon defaulted on its sovereign debt for the first time in its history. Lebanese banks hold a substantial part of such debt, and the default significantly affected the value of such holding.

f. As additional evidence, the Lebanese Parliament enacted a law on October 26, 2020 requesting that the banks make available payment by transfer abroad for one time only a sum of USD 10,000 (ten thousand United States Dollars) for the benefit of each Lebanese student already registered in universities and high institutes of education abroad for the academic year 2020-2021. A similar law is waiting in parliament to be voted and enacted for the academic year 2021-2022.

43. The aforementioned measures prescribing the restricted use of the limited foreign currency funds available in Lebanon aim at preventing the irremediable collapse of the banking sector, which may in turn lead to the loss of the depositors' funds. Such measures and the situation described in the preceding paragraph make it impossible for the banks to freely meet the

---

[5] *Ref.* Intermediate Decisions No.13113 dated September 30, 2019 and No.13152 dated November 26, 2019; Intermediate Decision No.13228 dated May 27, 2020; and Intermediate Decisions No.13229 dated May 27, 2020 and No.13245 dated July 8, 2020. Some of the CBL decisions cited in this Report have been later amended, but the restrictions on the use of foreign currency funds remain.

international transfer requests of their clients. Plaintiffs' claims that their international transfers request must be performed by the Bank should be rejected on this ground too.

44. Pursuant to the CBL Basic Decision no. 13217 of April 9, 2020, and the Banking Control Commission Memorandum No. 13/2020 dated August 18, 2020, addressed to all banks operating in Lebanon, the above-described restrictive measures for transfers and withdrawal of funds by account holders in foreign currency do not apply to transfers and withdrawals requested out of new funds which would be received from abroad. This is what was commonly referred to as "fresh funds" received by the banks.

45. The Lebanese government, addressing the present crisis, is working on a plan of restructuring and rescheduling its debts and has engaged international financial advisors to negotiate with its foreign and local lenders, as well as international financial institutions such as the International Monetary Fund and the World Bank.

46. The present financial crisis encountered by Lebanon and the process to reorganize its economy is similar to situations experienced in recent years by many other countries which have dealt with economic difficulties, such as Cyprus, Greece, and Argentina.

47. I conclude that the Bank has no duty under Lebanese law to perform the international transfers required by the Plaintiffs. As a result, refraining from performing such transfers is not a breach of the Bank's obligations under the Agreements and under Lebanese law.

**E.    Conclusion**

**Based on the above, I am of the opinion that, under Lebanese law:**

a. Lebanese courts have exclusive jurisdiction over Plaintiffs' claims.

b. Lebanese law governs disputes between Plaintiffs and the Bank.

c. Lebanese courts are available and able to hear the Plaintiffs' claims efficiently and

independently.

d. The Bank has no obligation under Lebanese law to perform international transfers for the account of the Plaintiffs.

F. **Final Considerations**

48. The opinions expressed in this Declaration are limited to matters of the laws of Lebanon. I express no opinion with respect to the laws of any other jurisdiction, and it is assumed that no law of any other jurisdiction affects the conclusions in this Declaration.

49. This Declaration is given in light of the laws of Lebanon presently in force, as implemented by Lebanese courts. The opinions in the Declaration may vary if the laws were to be amended, repealed, or annulled, or applied differently by Lebanese courts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Fadi Moghaizel

Beirut, November 27, 2021

15