UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE S. ELGHOSSAIN, and MONA C. ELGHOSSAIN, <br><br> Plaintiffs, <br><br> - against - <br><br> BANK AUDI S.A.L., BANQUE DU LIBAN, and JOHN AND JANE DOES 1-10, <br><br> Defendants. | **ORDER** <br><br> 21 Civ. 2162 (PGG) (BCM) |

PAUL G. GARDEPHE, U.S.D.J.:

Pro se Plaintiffs George S. Elghossain and Mona C. Elghossain bring this action against Bank Audi S.A.L. ("Bank Audi"), Banque du Liban, and John and Janes Does 1-10, alleging civil conspiracy, fraud, breach of contract, conversion, unjust enrichment, promissory estoppel, and violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"). (See Am. Cmplt. (Dkt. No. 63) ¶¶ 259-400)

Defendant Bank Audi has moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(6), and the forum non conveniens doctrine. (See Bank Audi Mot. (Dkt. No. 64); Bank Audi Br. (Dkt. No. 65)) Defendant Banque du Liban has moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(6), and the forum non conveniens doctrine. (See Banque du Liban Mot. (Dkt. No. 67); Banque du Liban Br. (Dkt. No. 68))

In a February 23, 2023 Report and Recommendation ("R&R"), Judge Moses recommends granting both motions to dismiss. (R&R (Dkt. No. 94) at 28) Plaintiffs filed objections on April 21, 2023 (Pltf. Obj. (Dkt. No. 100)), and Defendants filed responses to

Plaintiffs' objections on May 12, 2023.  (Banque du Liban Resp. (Dkt. No. 104); Bank Audi

Resp. (Dkt. No. 106))

> For the reasons stated below, Judge Moses's R&R will be adopted in its entirety.

## BACKGROUND

### I.   FACTS[1]

> Plaintiffs – a married couple – are United States citizens of Lebanese descent who

reside in North Carolina.  They are "successful real estate investors who own and manage

income-producing properties," and George Elghossain "owns and operates a real estate

brokerage firm in North Carolina."  (R&R (Dkt. No. 94) at 4 (citing Am. Cmplt. (Dkt. No. 63) ¶¶

97, 164-66, 187-89))  "Plaintiffs regularly travel to Lebanon for both personal and business

reasons, and have kept bank accounts with Bank Audi, in Lebanon, since 1980."  Their accounts

are kept at the Zahle‚ Lebanon branch of Bank Audi, where they are managed by Mona

Doummar Charro, who is George Elghossain's "one-time neighbor and longtime friend."  (Id.

(citing Am. Cmplt. (Dkt. No. 63) ¶¶ 83-84, 224, 260))

> "At unspecified times in the past, the Elghossains inherited some parcels of real

estate in Lebanon, sold most of the parcels 'in USD,' and were able to have the proceeds

deposited into their Bank Audi accounts and then transferred, by wire, to their bank accounts in

the United States."  (Id. at 5 (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 86-87))  "Over time, there

---

[1]  Because the parties have not objected to Judge Moses' factual account, this Court adopts it in
full.  See Silverman v. 3D Total Solutions, Inc., No. 18 Civ. 10231 (AT), 2020 WL 1285049, at
*1 n.1 (S.D.N.Y. Mar. 18, 2020) ("Because the parties have not objected to the R&R's
characterization of the background facts . . . , the Court adopts the R&R's 'Background' section
and takes the facts characterized therein as true."); Hafford v. Aetna Life Ins. Co., No. 16 Civ.
4425 (VEC) (SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not
object to the Magistrate Judge's . . . recitation of the facts of this case, and the Court adopts them
in full.").

were 'at least five separate wire transfers in USD from Bank Audi in Lebanon to Plaintiffs' bank accounts in the United States to the tune of $840,000.00.'" (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶ 88)) "Until the events that gave rise to this action, [P]laintiffs' transfers from the U.S. to Lebanon were 'infrequent and insignificant.'" (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶ 89))

Bank Audi is "'a Lebanon-based commercial bank and financial services company headquartered in Beirut,' offering a variety of financial products and services." It "'maintains correspondent bank accounts in New York at large US banks,' including JPMorgan Chase."[2] (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 78, 93, 198)) Plaintiffs allege that Bank Audi also "'maintains a branch in New [York] City operating as Interaudi Bank[,] formerly [known] as Bank Audi (U.S.A.),'" but Judge Moses notes that "this assertion is disputed." (Id. (first alteration in original) (quoting Am. Cmplt. (Dkt. No. 63) ¶ 177))

Banque du Liban is the central bank of Lebanon. (Id. at 9 (citing Am. Cmplt. (Dkt. No. 63) ¶ 3)) "Plaintiffs do not allege any direct communications or other interaction with [Banque du Liban]. Nor do they allege any specific communications or interaction with [Banque du Liban] and Bank Audi." (Id.) Instead, Plaintiffs allege that Banque du Liban

> orchestrated a "Ponzi scheme" designed to delay the "imminent collapse of the Lebanese banking system," which was carried out by means of a conspiracy among [Banque du Liban] and Lebanon's commercial banks to "lure" Americans of Lebanese descent to deposit their dollars in LBP [Lebanese pound]-denominated accounts with promises of unsustainably high interest rates and "an alleged solid financial position."

---

[2] "'A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds. Correspondent accounts facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States.'" (R&R (Dkt. No. 94) at 5 n.3 (quoting Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 165 n.3 (2d Cir. 2013)))

(Id. at 9-10 (citations omitted) (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 3, 14, 17, 23, 82, 91-92, 103, 106, 204, 240, 342, 348, 358, 367))

According to Plaintiffs, in September 2018, Bank Audi "began a 'direct marketing campaign,' targeting existing clients in the Lebanese diaspora through WhatsApp calls and other means, to induce them to deposit additional U.S. dollars in a new type of account called 'Product 705.'"  (Id. at 5 (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 91, 105-06, 205, 213, 374))  "'Product 705' was a long-term deposit account that promised a 15% interest rate, but required that the foreign currency deposited into the account be converted into Lebanese pounds."  (Id. (citation omitted) (citing Am. Cmplt. (Dkt. No. 63) ¶¶ 16, 29, 91, 105, 115, 213))

Plaintiffs explained to their account manager – an individual identified in the Amended Complaint as "Charro" – that "'liquidity was critical' to them, and that any funds they deposited must be 'readily convertible into USD' and available anytime to transfer outside Lebanon to anywhere in the world.'"  Charro assured George Elghossain that "even though the new account had a 'maturity period' of five years, [P]laintiffs would be able to close the account with only one month's notice and would only have to pay a penalty of one month's interest." (Id. at 6 (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 98, 132, 195, 206-09, 311))  Bank Audi "told [P]laintiffs that, 'as in the past there would be no restrictions on Plaintiffs withdrawing their USD and accrued interest or transferring their USD out of Lebanon.'"  (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶ 210))

On October 22, 2018, Plaintiffs wired $400,000 from their account at Coastal Federal Credit Union in North Carolina to one of their Bank Audi accounts in Lebanon.  "'The wire instructions designated Bank Audi's correspondent bank as JPMorgan Chase Bank' in New

4

York," and Bank Audi "'utilized its correspondent bank account in New York' to accept the transfer."  (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 108, 111, 198, 217-18, 244))

On October 29, 2018, George Elghossain traveled to Lebanon, and on November 1, 2018, he met with Charro at the Zahle branch of Bank Audi.  According to Plaintiffs, Charro "was 'positive' about 'the future of the Lebanese economy, the pegged exchange rate, and [the] political climate.'"  (Id. (alteration in original) (quoting Am. Cmplt. (Dkt. No. 63) ¶ 113))  On November 1, 2018, George Elghossain "opened an LBP-denominated joint term account" based on Product 705.  (Id. (citing Am. Cmplt. (Dkt. No. 63) ¶¶ 112-15))  The Elghossains deposited a total of $481,000 into the new account, "which was converted into LBP 'at an exchange rate of 1,513 LBP per $1,' for a total 'LBP deposit of 726,253,000.'"  (Id. at 7 (quoting Am. Cmplt. (Dkt. No. 63) ¶ 115))

The Elghossains executed account-opening documents, and delivered them to the Zahle branch, on March 30, 2019, along with an executed "General Agreement for Opening and Activating Accounts and General Terms and Conditions for Electronic Banking Services" (the 2018 Agreement).[3]  (Id. (citing Am. Cmplt. (Dkt. No. 63) ¶¶ 115-17, 221-22, 224))

In 2019, the Elghossains "attempted to close their joint term account early, in order to take advantage of a real estate investment opportunity that presented itself in North Carolina."  (Id. at 8 (citing Am. Cmplt. (Dkt. No. 63) ¶¶ 226, 229, 253))  In August 2019, George Elghossain verbally instructed Charro to wire $500,000 to Plaintiffs' U.S. account at

---

[3]  The 2018 Agreement is dated November 1, 2018, and is signed by both Plaintiffs.  The Agreement provides that it "shall be governed by and construed in accordance with Lebanese laws," and that "Beirut courts shall have jurisdiction over any dispute that may arise of this Agreement and its annexes or of the [a]ccounts of the [c]lient or the other [a]ccount holders and all matters related to or resulting from the [a]ccounts."  (Elghossain Am. Decl., Ex. 9 (Dkt. No. 58-9) at 8)

Wells Fargo, N.A.  (Id. (citing Am. Cmplt. (Dkt. No. 63) ¶¶ 227-30, 261))  That transfer was not made.  (Id.)  Accordingly, "[o]n October 9, 2019, [George] Elghossain traveled to Lebanon, and on or about October 12, 2019, he met with Charro at the Zahle branch to deliver his instructions in person."  (Id. (citation omitted) (citing Am. Cmplt. (Dkt. No. 63) ¶¶ 125, 127, 135, 141-42)) According to Plaintiffs, "[t]he official exchange rate at that time was still 1,507.50 LBP per $1, but 'the bank crisis in Lebanon had already become acute,' and a 'silent run on the banks' had begun."  (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 56, 125, 138, 232))

During the October 12, 2019 meeting, Charro "assured [George] Elghossain that Bank Audi was not in a 'liquidity crisis,' and that no 'capital controls had been implemented by the Lebanese government,' but that 'Bank Audi was temporarily unable to wire transfer any USD outside Lebanon.'"  (Id. (citation omitted) (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 142, 234-35))  George Elghossain requested "'a bank draft in USD drawn on any Bank Audi overseas subsidiary[,] preferably any of its correspondent banks in New York City,' but . . . Charro 'indicated that Bank Audi would not approve that' either."  (Id. at 8-9 (quoting Am. Cmplt. (Dkt. No. 63) ¶ 144))  George Elghossain "left a 'standing instruction' to close 'all accounts [at Bank Audi] and [to] wire transfer all [his] money to [his] account in the United States,' but Bank Audi failed to do so."  (Id. at 9 (citations omitted) (first alteration in original) (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 123, 146, 153-54, 231, 233, 252, 276))

In about June 2020, Charro contacted George Elghossain "via WhatsApp with an offer to close the joint term account and issue [P]laintiffs an LBP-denominated check that could only be negotiated in Lebanon for a three-year term."  George Elghossain "declined that offer and instead requested that Bank Audi release 'all his deposits including earned interest to be paid immediately by a USD bank draft on a US Bank where Bank Audi has a lot of cash or cash

equivalent assets,'" but Charro "replied that Bank Audi 'will never "do that."'" (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 255, 258))

 According to Plaintiffs, the Lebanese bank accounts "became nearly worthless in late 2019 when, in order to stem a run on the banks caused by 'remittances drying up and depositors queuing up to withdraw cash,' [Banque du Liban] and the commercial banks conspired to impose 'draconian' but 'unofficial' capital controls." (Id. at 10 (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 47, 55-57)) "This made it difficult, if not impossible, for ordinary bank customers to withdraw their dollars, although 'politically connected depositors' were given preferential treatment and allowed to transfer funds out of Lebanon." (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 43, 56, 249-50, 268)) "The 'dollar deposits' made by non-elite bank customers, like [P]laintiffs, are now trapped in Lebanon, where they are 'frozen and effectively worthless.'" (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶ 57))

 As to damages, Plaintiffs "allege that they lost 'around $650,000.00 USD in principal and accrued interest' in their Bank Audi accounts." (Id. at 10 (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 90, 104, 283, 294, 306)) They allege that they "still have 'several active accounts' at the Zahle branch in addition to the joint term account they opened in 2018." (Id. (quoting Am. Cmplt. (Dkt. No. 63) ¶ 130)) "Although they could withdraw their money in Lebanese pounds, the currency is 'almost worthless,' having lost 85% of its value by the date of the Amended Complaint, and more since." (Id. citation omitted) (quoting Am. Cmplt. (Dkt. No. 63) ¶ 38)) Plaintiffs further allege that "they suffered 'substantial injury' in the United States, including the loss of hundreds of thousands of dollars that they would have earned had they been able to take advantage of the investment opportunity that presented itself in August 2019." (Id. at 10-11 (citation omitted) (quoting Am. Cmpt. (Dkt. No. 63) ¶¶ 156, 226, 238, 284)) "Plaintiffs

seek 'compensatory and exemplary damages' in excess of $3 million, which, together with treble damages under RICO, comes to over $9 million in claimed damages." (Id. at 11 (citation omitted) (quoting Am. Cmplt. (Dkt. No. 63) ¶¶ 90, 163, 317, 325, 329, 335, 393, 400))

## II.   **PROCEDURAL HISTORY**

The Complaint was filed on March 11, 2021. (Cmplt. (Dkt. No. 1)) On March 26, 2021, this Court referred the case to Magistrate Judge Moses for general pretrial supervision. (Dkt. No. 10)

On November 29, 2021, Defendant Bank Audi moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(6), and the forum non conveniens doctrine. (See Bank Audi Mot. (Dkt. No. 41); Bank Audi Br. (Dkt. No. 42)), and Defendant Banque du Liban moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(6), and the forum non conveniens doctrine. (See Banque du Liban Mot. (Dkt. No. 44); Banque du Liban (Dkt. No. 45)) On January 3, 2022, this Court referred Defendants' motions to Judge Moses for an R&R. (Dkt. No. 50)

In a January 24, 2022 letter, Defendant Bank Audi notified the Court that Plaintiffs intended to seek leave to amend, and that the parties had agreed to a briefing schedule. (Jan. 24, 2022 Jt. Ltr. (Dkt. No. 51)) On January 26, 2022, Judge Moses set a briefing schedule for Plaintiffs' motion to amend, and deemed the pending motions to dismiss withdrawn, without prejudice to refiling if Plaintiffs' motion to amend was denied. (Jan. 26, 2022 Order (Dkt. No. 52))

On April 13, 2022, Plaintiffs filed their motion to amend. (Pltf. Mot. (Dkt. No. 59)) In a May 11, 2022 letter, Defendant Bank Audi informed Judge Moses that Defendants consented to the filing of an amended complaint, and that the parties had agreed to a briefing schedule for Defendants' motions to dismiss the Amended Complaint. (May 11, 2022 Jt. Ltr.

(Dkt. No. 61))  On May 12, 2022, Judge Moses authorized Plaintiffs to file the Amended Complaint, and adopted the parties' requested briefing schedule.  (May 12, 2022 Order (Dkt. No. 62))

On May 13, 2022, Plaintiffs filed the Amended Complaint.  (Am. Cmplt. (Dkt. No. 63))  On June 24, 2022, Defendant Bank Audi moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(6), and the forum non conveniens doctrine (see Bank Audi Mot. (Dkt. No. 64); Bank Audi Br. (Dkt. No. 65)), and Defendant Banque du Liban moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(6), and the forum non conveniens doctrine.  (See Banque du Liban Mot. (Dkt. No. 67); Banque du Liban Br. (Dkt. No. 68))  On June 29, 2022, this Court referred these motions to Judge Moses for an R&R.  (Dkt. No. 72))

In a February 23, 2023 R&R, Judge Moses recommends that the Defendants' motions to dismiss be granted.  Judge Moses concludes that Plaintiffs' claims against Banque du Liban must be dismissed under the Foreign Sovereign Immunities Act, and that Plaintiffs' claims against Bank Audi should be dismissed without prejudice for lack of personal jurisdiction.  In the alternative, Judge Moses recommends dismissing without prejudice all claims under the doctrine of forum non conveniens.  (R&R (Dkt. No. 94) at 28)  Plaintiffs sought and obtained extensions of time to file objections to the R&R (see Mar. 13, 2023 Pltf. Ltr. (Dkt. No. 95); Mar. 15, 2023 Order (Dkt. No. 96); Apr. 4, 2023 Pltf. Ltr. (Dkt. No. 97); Apr. 7, 2023 Order (Dkt. No. 99)), and Plaintiffs filed their objections on April 21, 2023.  (Pltf. Obj. (Dkt. No. 100))  Defendants filed their responses to Plaintiffs' objections on May 12, 2023.  (Banque du Liban Resp. (Dkt. No. 104); Resp. Bank Audi (Dkt. No. 106))

III.    **THE MAGISTRATE JUDGE'S R&R**

In her R&R, Judge Moses finds that

> there is no need to reach the merits of [P]laintiffs' claims against either
> [D]efendant, because (i) the FSIA clearly strips this Court of subject matter
> jurisdiction with respect to [Banque du Liban]; (ii) this Court just as clearly
> cannot exercise personal jurisdiction over Bank Audi; and (iii) even if this Court
> could properly exercise both subject matter and personal jurisdiction, [P]laintiffs'
> claims should be litigated in Lebanon rather than in a District where no party
> resides, no party has any substantial ties, and no witnesses or evidence can be
> found.

(R&R (Dkt. No. 94) at 15)

A.    **Foreign Sovereign Immunity Act**

Defendant Banque du Liban argues that Plaintiffs' claims against it must be

dismissed pursuant to Fed. R. Civ. P. 12(b)(1), because it is immune from suit under the Foreign

Sovereign Immunities Act ("FSIA").  (Banque du Liban Br. (Dkt. No. 68) at 13-21)

In her R&R, Judge Moses notes that "Plaintiffs do not dispute that [Banque du

Liban] is an agency or instrumentality of the Republic of Lebanon.  Nor could they."  (R&R

(Dkt. No. 94) at 15)  "As the Second Circuit explained in Daou[ v. BLC Bank, S.A.L., 42 F.4th

120 (2d Cir. 2022)], '[Banque du Liban], as the central bank of Lebanon, is an agency or

instrumentality of the Lebanese state, and thus it is entitled to sovereign immunity unless one of

the FSIA's statutory exceptions applies.'"  (Id. at 15-16 (quoting Daou, 42 F.4th at 133))

Judge Moses finds that the "only potentially applicable exception" under the

FSIA is "the 'commercial activity' exception," but concludes that this exception "cannot save the

Elghossains' claims against [Banque du Liban]."  (Id. at 16)  That exception "abrogates FSIA's

grant of sovereign immunity where a claim is":

> ". . . based upon a commercial activity carried on in the United States by the
> foreign state; or upon an act performed in the United States in connection with a
> commercial activity of the foreign state elsewhere; or upon an act outside the

> territory of the United States in connection with a commercial activity of the
> foreign state elsewhere and that act causes a direct effect in the United States."

(Id. (quoting 28 U.S.C. § 1605(a)(2)))

In Daou, Plaintiffs brought suit against certain commercial banks and Banque du Liban, alleging, inter alia, that "'[Banque du Liban] allow[ed] the [c]ommercial [b]anks to open checking accounts, which the [c]ommercial [b]anks then used to write checks to the Daous, and then den[ied] requests by banks in the United States to transfer the funds upon deposit of those checks.'" (Id. (second and seventh alterations in original) (quoting Daou, 42 F.4th at 134))  The Second Circuit found that this conduct did not constitute "commercial activity," because the exception "applies 'only where the action is "based upon" the commercial activity in question' and has a '"direct effect in the United States' within the meaning of the FSIA.'"  The Daou court notes that "[a]n action 'is "based upon" the "particular conduct" that constitutes the "gravamen" of the suit.'"  (Id. at 17 (citation omitted) (quoting Daou, 42 F.4th at 134-35))  "Without deciding whether [the transactions in Daou] formed the 'gravamen' of the Daous' claims, the Second Circuit held that it did not have a 'direct effect in the United States,' and on that basis affirmed the District Court's FSIA decision."  (Id. (quoting Daou, 42 F.4th at 135))

Here, Judge Moses finds that "[t]he Elghossains' claims are not even arguably 'based on' any 'commercial activity' by [Banque du Liban], much less any commercial activity that had a 'direct effect,' as that term is used in 28 U.S.C. § 1605(a)(2), in the United States."  (Id. at 17-18)  "To the contrary:  the Elghossains were never furnished with any checks issued by or drawn against [Banque du Liban].  Consequently, they 'have even less of a basis to invoke the commercial activity exception' than did the Daous."  (Id. at 18 (citation omitted) (citing Am. Cmplt. (Dkt. No. 63) ¶¶ 255-58); Banque du Liban Reply (Dkt. No. 85) at 5))  Accordingly,

Judge Moses recommends dismissing Plaintiffs' claims against Banque du Liban, pursuant to Fed. R. Civ. P. 12(b)(1).  (Id.)

    **B.**    **Personal Jurisdiction**

        Defendant Bank Audi argues that Plaintiffs' claims against it should be dismissed, pursuant to Fed. R. Civ. P. 12(b)(2), because Plaintiffs have not established that Bank Audi transacted business in New York for purposes of New York's long-arm statute.  (Bank Audi Br. (Dkt. No. 65) at 20-28)

        Judge Moses finds that Bank Audi – "a Lebanese bank headquartered in Beirut" – "is not 'at home' in New York and therefore is not subject to general personal jurisdiction here." (R&R (Dkt. No. 94) at 20 (citing Am. Cmplt. (Dkt. No. 63) ¶ 78))

> Nor [is it] subject to specific personal jurisdiction pursuant to New York's long-arm statute, which, as relevant here, permits the courts of New York to "exercise personal jurisdiction over any non-domiciliary [that] in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state," but only as to claims "arising from" that conduct.

(Id. (omission and second alteration in original) (quoting N.Y. C.P.L.R. § 302(a)(1)))

        Judge Moses finds that "the Elghossains have adequately demonstrated that Bank Audi 'transacted business within the state'" by alleging that

> Bank Audi regularly used New York correspondent accounts to move money to and from the United States, including "at least five separate wire transfers in USD from Bank Audi in Lebanon to Plaintiffs' bank accounts in the United States to the tune of $840,000.00," and one transfer of $400,000 on October 22, 2018, from [P]laintiffs' bank in North Carolina to Bank Audi, in anticipation of opening their new joint term account.

(Id. at 21 (citation omitted) (quoting Licci, 732 F.3d at 168; Am. Cmplt. (Dkt. No. 63) ¶¶ 88-89, 108-11))  The Elghossains have not, however, "shown that their claims 'arose from' Bank Audi's use of correspondent accounts in New York."  (Id.)

According to Judge Moses, "[o]nce again, <u>Daou</u> is fatal to [P]laintiffs' claims."

(<u>Id.</u> at 23)

> [I]n <u>Daou</u>, the Second Circuit held squarely that there was "no substantial connection between the [c]ommercial [b]anks' use of their correspondent accounts and the Daous' claims," because those claims (for civil conspiracy, fraud, breach of contract, conversion, unjust enrichment, promissory estoppel, and civil RICO violations, among other theories) all "turn[ed] on alleged measures taken by Lebanese banks in Lebanon to ensure that USD deposits remained in that country," but [P]laintiffs failed to allege that the banks "used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated – namely, that the Daous' USD remained in Lebanon." The Second Circuit also considered, and rejected, the Daous' argument that the required nexus was supplied by their allegations that the banks "advertised the availability of their New York correspondent accounts to potential customers and used those accounts to transfer some of the millions of dollars in the Daous' accounts into Lebanon in the first instance." Judge Lynch, writing for the panel, explained that "[t]he connection between those past transactions and the claims in the [Daous' first amended complaint] is merely coincidental," because the banks "could have routed the Daous' USD deposits through correspondent accounts in Florida, London, or Switzerland, or through no correspondent account at all."

(<u>Id.</u> at 22) (citations omitted) (fourth, sixth, and seventh alterations in original) (quoting 42 F.4th at 132))

Judge Moses explains that, "[l]ike the Daous, the Elghossains allege that Bank Audi 'advertised' their New York correspondent accounts, used them over the years to wire money to [P]laintiffs in North Carolina, and arranged for [P]laintiffs to use one such account to wire a portion of the money that they deposited in their new joint term account and then lost when Bank Audi refused to send it back." (<u>Id.</u> at 23 (citations omitted) (citing Am. Cmplt. (Dkt. No. 63) ¶¶ 14, 82, 111, 198, 218, 244, 276, 377)) "However, all of their claims turn on the measures that Bank Audi took 'in Lebanon to ensure that USD deposits remained in that country,' and the connection between the correspondent accounts and those claims is 'merely coincidental.'" (<u>Id.</u> (citation omitted) (quoting <u>Daou</u>, 42 F.4th at 132))

13

Judge Moses concludes that, "[b]ecause the Elghossains have not shown that Bank Audi is subject to either general or specific personal jurisdiction in this Court, their claims against Bank Audi should be dismissed without prejudice, pursuant to Rule 12(b)(2), and their alternative request for jurisdictional discovery should be denied." (Id. (citation omitted) (citing Pltf. Opp. Br. (Dkt. No. 84) at 14-15; Daou, 42 F.4th at 133 n.6))

### C.       *Forum Non Conveniens*

Defendants also argue that the forum non conveniens factors support dismissal of this case in favor of a Lebanese forum.  (Banque du Liban Br. (Dkt. No. 68) at 24-27; Bank Audi Br. (Dkt. No. 65) at 20)

Although Judge Moses says that it is not necessary to "reach the branch of [D]efendants' motions seeking dismissal on forum non conveniens grounds," "[s]hould [the Court] do so, . . . [P]laintiffs' claims against both [D]efendants should be dismissed, without prejudice, so that [P]laintiffs can pursue their claims in Lebanon."  (R&R (Dkt. No. 94) at 28)

She explains that courts consider three factors in performing a forum non conveniens analysis:  "(1) 'the degree of deference properly accorded the plaintiffs' choice of forum'; (2) 'whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute'; and (3) the balance of 'the private and public interests implicated in the choice of forum.'"  (Id. at 24-25 (quoting Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005)))

As to the first factor, Judge Moses finds that "[P]laintiffs reside in North Carolina, identify no bona fide connection to New York, and make no claim that they chose this District for reasons of convenience.  Nor do they (or could they) claim that the Southern District of New York is [the] only U.S. forum 'where the [D]efendant is amenable to suit.'"  (Id. at 25 (quoting Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir. 2001)))  Noting that "[P]laintiffs argue

14

for the application of New York law to their common-law claims, and seek treble damages under RICO" (id. at 26 (citation omitted) (citing Pltf. Opp. (Dkt. No. 84) at 25, 37-38; Am. Cmplt. (Dkt. No. 63) ¶¶ 336-400)), Judge Moses finds that "[P]laintiffs selected this District at least in part to 'win a tactical advantage' from local and U.S. law, rather than due to convenience, necessity, or any bona fide connection to the forum." Accordingly, Plaintiffs' "choice of forum is entitled to 'less deference,' than if that choice had been 'dictated by reasons that the law recognizes as valid.'" (Id. (citation omitted) (quoting Iragorri, 274 F.3d at 71-72))

As to the second factor, Judge Moses finds that "the Lebanese judicial system provides an adequate alternative forum." (Id.) "Both [Banque du Liban] and Bank Audi acknowledge that they are subject to the jurisdiction of the Lebanese courts." (Id. (citing Banque du Liban Br. (Dkt. No. 68) at 25; Bank Audi Br. (Dkt. No. 65) at 20)) "Bank Audi's legal expert attests to the continued ability of Lebanese courts to hear cases, and provides examples of cases heard by Lebanese courts concerning claims almost identical to those brought by [P]laintiffs." (Id. (citation omitted) (citing Rotenberg Decl., Ex. 3 ("Moghaizel Decl.") (Dkt. No. 66-3) ¶¶ 23-33; Bank Audi Reply, Ex. 4 ("Second Moghaizel Decl.") (Dkt. No. 86-5) ¶¶ 24-37))

As to the third factor, Judge Moses finds that "nearly all the private and public interests at play weigh heavily in favor of litigating this case in Lebanon." (Id. at 27) She explains that, as in Daou, "'New York has minimal interest in this litigation. None of the parties are domiciled here and almost none of the relevant facts occurred here.'" (Id. (quoting Daou v. BLC Bank, S.A.L., No. 20 Civ. 4438 (DLC), 2021 WL 1338772, at *5 (S.D.N.Y. Apr. 9, 2021), aff'd, 42 F.4th 120 (2d Cir. 2022))) "'By contrast, Lebanon has a significant interest in a dispute between Lebanese[-American] plaintiffs and Lebanese bank defendants regarding financial transactions that took place in Lebanon.'" (Id. (alteration in original) (quoting Daou, WL

1338772, at *5))  She further finds that "'[t]his interest is pronounced, given the crisis in

Lebanon from which this lawsuit arises, the allegations against a Lebanese commercial bank and

the [c]entral [b]ank, and the key questions of Lebanese law implicated.'"  (Id. at 28 (quoting

Bank Audi Br. (Dkt. No. 65) at 28))

> And while Plaintiffs argue "that New York 'has a strong interest in protecting the

integrity of its banking system'" (id. (quoting Pltf. Opp. (Dkt. No. 84) at 23)), Judge Moses

points out that "this case is not about New York's banking system; it is about Lebanon's banking

system and, more specifically, the conduct of one Lebanese commercial bank, and that country's

central bank, in the context of the ongoing Lebanese financial crisis."  (Id.)[4]

> For all these reasons, Judge Moses concludes that – in the event this Court

reaches the issue of forum non conveniens – it should dismiss Plaintiffs' claims without

prejudice in favor of a Lebanese forum.

## IV.   PLAINTIFFS' OBJECTIONS TO THE R&R

> Plaintiffs contend that "the R&R should not be followed, and this case should not

be dismissed."  (Pltf. Obj. (Dkt. No. 100) at 1)  They make four specific objections to the R&R:

> (1) "most of Plaintiffs' pleadings were disregarded by the magistrate [judge] because of a procedural error that could easily be corrected" (id. at 2);

---

[4] Bank Audi also argues that Plaintiffs' agreements with Bank Audi contain mandatory forum selection clauses requiring Plaintiffs to bring their claims in Lebanon.  (Bank Audi Br. (Dkt. No. 65) at 16-20)  Judge Moses acknowledges that the 2018 Agreement "provides that 'Beirut courts shall have jurisdiction over any dispute that may arise [out] of this Agreement and its annexes or of the [a]ccounts of the [c]lient or the other [a]ccount holders and all matters related to or resulting from the [a]ccounts.'"  (R&R (Dkt. No. 94) at 24 (quoting Elghossain Am. Decl., Ex. 9 (Dkt. No. 58-9) at 8))  She notes, however, that "the Second Circuit [has] held that "the precise clause at issue here (in a contract between Bank Audi and another customer) is permissive, not mandatory, because it 'specifies jurisdiction . . . but contains no additional language indicating that the Beirut courts have exclusive jurisdiction.'"  (Id. (emphasis and omission in original) (quoting Raad v. Bank Audi SAL, No. 21-2612, 2022 WL 17684581, at *3 (2d Cir. Dec. 15, 2022) (summary order)))  Accordingly, Bank Audi's arguments regarding the forum selection clause are not persuasive.

(2) Judge Moses erred in recommending dismissal of Plaintiffs' claims against Banque du Liban for lack of subject matter jurisdiction, because the commercial activity exception to the FSIA applies (id. at 3-4);

(3) Judge Moses erred in recommending dismissal of Plaintiffs' claims against Bank Audi for lack of personal jurisdiction, because "Bank Audi is subject to [l]ong-[a]rm [j]urisdiction in New York and . . . exercising [personal] [j]urisdiction [over Bank Audi] [c]omports with [d]ue [p]rocess" (id. at 6); and

(4) Judge Moses' forum non conveniens analysis is flawed, because "Defendant Bank Audi ha[s] failed to satisfy [its] burden of establishing that an alternative adequate forum exists and the balance of the private and public interest factors weigh against the alternative forum." (Id.)

Banque du Liban and Bank Audi contend that the R&R should be adopted in its entirety. (Banque du Liban Resp. (Dkt. No. 104); Bank Audi Resp. (Dkt. No. 106))

## **DISCUSSION**

### I.    **LEGAL STANDARDS**

#### A.    **Review of a Magistrate Judge's Report and Recommendation**

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.'" Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Inv. Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)). A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

Where a timely objection has been made to a magistrate judge's recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'" Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (second alteration in original) (quoting Vega v. Artuz, 97 Civ. 3775 (LTS) (JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). "'[T]o the extent . . . that the [objecting] party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the [R&R] strictly for clear error." DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009) (omission in original) (quoting IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., No. 07 Civ. 6865 (LTS) (GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008)). Although "[t]he objections of parties appearing pro se are 'generally accorded leniency' and should be construed "to raise the strongest arguments that they suggest,' . . . even a pro se party's objections to a[n] [R&R] must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument.'" Id. at 340 (quoting Milano v. Astrue, No. 05 Civ. 6527 (KMW) (DCF), 2008 WL 4410131, at *24 (S.D.N.Y. Sept. 26, 2008), aff'd, 382 F. App'x 4 (2d Cir. 2010); Pinkney v. Progressive Home Health Servs., No. 06 Civ. 5023 (LTS) (JCF), 2008 WL 2811816, at *2-3 (S.D.N.Y. July 21, 2008), aff'd, 367 F. App'x 210 (2d Cir. 2010)).

B.    **Rule 12(b)(1) Motion to Dismiss and the Foreign Sovereign Immunities Act**

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)." Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31

(2007). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In reviewing a Rule 12(b)(1) motion, a court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004).

In considering a motion to dismiss for lack of subject matter jurisdiction, the "'district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003) (quoting Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000)). "This discretion includes the ability to 'resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits.'" Freund v. Republic of France, 592 F. Supp. 2d 540, 553 (S.D.N.Y. 2008) (quoting Filetech S.A. v. Fr. Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998)). The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but . . . may not rely on conclusory or hearsay statements contained in the affidavits." J.S. ex rel. N.S., 386 F.3d at 110. A court may also "consider 'matters of which judicial notice may be taken.'" Greenblatt v. Gluck, No. 03 Civ. 597 (RWS), 2003 WL 1344953, at *1 n.1 (S.D.N.Y. Mar. 19, 2003) (quoting Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993)).

The Foreign Sovereign Immunities Act ("FSIA") is the "sole basis for obtaining jurisdiction over a foreign state." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). Under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," 28 U.S.C. § 1604, "unless a specific statutorily

defined exception applies." Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi, 215

F.3d 247, 251 (2d Cir. 2000).  If no such exception applies, "'a federal court lacks subject-matter

jurisdiction over a claim against a foreign state.'"  Fed. Republic of Germany v. Philipp, 141

S.Ct. 703, 709 (2021) (quoting Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993)).

In connection with a motion to dismiss for lack of subject matter jurisdiction

under the FSIA, "the defendant must present a 'prima facie case that it is a foreign sovereign,'

. . . [after which] the plaintiff 'has the burden of going forward with evidence showing that,

under exceptions to the FSIA, immunity should not be granted.'"  Virtual Countries, Inc. v.

Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002) (emphasis omitted) (quoting Cargill

Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993)).  "Where the plaintiff

satisfies her burden that an FSIA exception applies, the foreign sovereign then bears the ultimate

burden of persuasion that the FSIA exception does not apply."  Swarna v. Al-Awadi, 622 F.3d

123, 143 (2d Cir. 2010).

Here, Plaintiffs contend that the "commercial activity" exception to the FSIA

applies.  (Pltf. Obj. (Dkt. No. 100) at 4)  The FSIA provides that a foreign state is not immune in

any case

> in which the action is based upon a commercial activity carried on in the United
> States by the foreign state; or upon an act performed in the United States in
> connection with a commercial activity of the foreign state elsewhere; or upon an
> act outside the territory of the United States in connection with a commercial
> activity of the foreign state elsewhere and that act causes a direct effect in the
> United States.

28 U.S.C. § 1605(a)(2).  The FSIA defines "commercial activity" as "either a regular course of

commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).  "[T]he

commercial activity exception applies only where the action is 'based upon' the commercial

activity in question."  Daou, 42 F.4th at 134 (quoting 28 U.S.C. § 1605(a)(2)).  "'[A]n action is

based upon the particular conduct that constitutes the gravamen of the suit.'" Id. (quoting OBB

Personenverkehr AG v. Sachs, 577 U.S. 27, 35 (2015)).

       In their objections, Plaintiffs argue that Banque du Liban committed "'an act

outside the territory of the United States in connection with a commercial activity of the foreign

state elsewhere and that act cause[d] a direct effect in the United States.'"  (Pltf. Obj. (Dkt. No.

100) at 4 (emphasis omitted) (quoting 28 U.S.C. § 1605(a)(2))[5]

       To invoke this provision of the commercial activity exception, a plaintiff must

establish that (1) the foreign entity engaged in "'a commercial activity,'" (2) "'the action is based

upon'" that activity, and (3) that activity "'cause[d] a direct effect in the United States.'"  Daou,

42 F.4th at 134 (alteration in original) (quoting 28 U.S.C. § 1605(a)(2)).  "'[A]n effect is direct'

for purposes of the commercial activity exception 'if it follows as an immediate consequence of

the defendant's activity.'"  Id. at 135 (alteration in original) (quoting Republic of Argentina v.

Weltover, Inc., 504 U.S. 607, 618 (1992)).

    **C.**    **Rule 12(b)(2) Motion to Dismiss**

       "The plaintiff bears the burden of establishing that the court has jurisdiction over

the defendant when served with a Rule 12(b)(2) motion to dismiss."  Whitaker v. Am.

Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001) (citing Robinson v. Overseas Mil. Sales

Corp., 21 F.3d 502, 507 (2d Cir. 1994)).  The nature of the plaintiff's burden "varies depending

on the procedural posture of the litigation."  Ball v. Metallurgie Hoboken-Overpelt, S.A., 902

F.2d 194, 197 (2d Cir. 1990).  Prior to discovery, a plaintiff may carry this burden "by pleading

in good faith legally sufficient allegations of jurisdiction.  At that preliminary stage, the

plaintiff's prima facie showing may be established solely by allegations."  Id. (citation omitted)

---

[5] Plaintiffs made no such argument in their opposition to Banque du Liban's motion to dismiss.
(See R&R (Dkt. No. 94) at 11)

(citing Fed. R. Civ. P. 11).  "A plaintiff can make this showing through his 'own affidavits and supporting materials[,]' containing 'an averment of facts that, if credited . . . , would suffice to establish jurisdiction over the defendant.'"  Whitaker, 261 F.3d at 208 (alteration and omission in original) (quoting Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981); Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996)).

Accordingly, this Court may consider material outside the pleadings in resolving Bank Audi's motion to dismiss for lack of personal jurisdiction, and must construe such material "'in the light most favorable to plaintiffs, resolving all doubts in their favor.'"  S. New England Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 138 (2d Cir. 2010) (quoting Porina v. Marward Shipping Co. Ltd., 521 F.3d 122, 126 (2d Cir. 2008)).

## II.   ANALYSIS

### A.   Foreign Sovereign Immunities Act

Plaintiffs object to the R&R's recommendation that their claims against Banque du Liban be dismissed for lack of subject matter jurisdiction, pursuant to the FSIA.  (Pltf. Obj. (Dkt. No. 100) at 3-4)  They contend that "[t]his case falls within one of the exceptions of the FSIA, which would automatically give this court jurisdiction over the foreign state defendant." (Id. at 4)  According to Plaintiffs, "[t]he 'commercial activity' exception provides the basis for this lawsuit against [Banque du Liban] as an agency and instrumentality of Lebanon for an extraordinarily wide array of activities, including the promotion of investment opportunities abroad, and state involvement in fraudulent schemes all by the Governor with tacit approval of its 'BOARD.'"  (Id. (emphasis in original))

In support of their objection, Plaintiffs make entirely speculative and conclusory assertions as to how the commercial activity exception applies to this case.  (See, e.g., id. ("Lebanon's as well as Europe[]'s investigations into [Banque du Liban]'s Governor implicate

[Banque du Liban], its 'BOARD' and other top executives at [Banque du Liban]." (emphasis in original)); id. at 5 ("[I]t appears that even though the investigations into the Governor are at an advanced stage the jury is still out in connection with [Banque du Liban] and its Governor." (emphasis omitted)); id. ("Based on the above arguments [Banque du Liban]'s immunity remains uncertain therefore the Court should not dismiss Plaintiffs' claims against [Banque du Liban] for lack of subject matter jurisdiction, certainly the dismissal 'with Prejudice' should be denied." (emphasis omitted)))

   As an initial matter, Judge Moses correctly concludes that "'[Banque du Liban], as the central bank of Lebanon, is an agency or instrumentality of the Lebanese state, and thus it is entitled to sovereign immunity unless one of the FSIA's statutory exceptions applies.'" (R&R (Dkt. No. 94) at 15-16 (quoting Daou, 42 F.4th at 133))  Judge Moses' conclusion that the commercial activity exception to the FSIA does not apply is also clearly correct, given that the Amended Complaint pleads no facts showing any communication or transaction between Plaintiffs and Banque du Liban.  Plaintiffs' assertions in their objections about investigations of Banque du Liban and its Governor are irrelevant to the R&R's conclusion that "[t]he Elghossains' claims are not even arguably 'based on' any 'commercial activity' by [Banque du Liban], much less any commercial activity that had a 'direct effect,' as that term is used in 28 U.S.C. § 1605(a)(2), in the United States." (Id. at 17-18)  To the extent that Plaintiffs contend that the Banque's activities caused them financial injury, "'the mere fact that a foreign state's commercial activity outside of the United States caused . . . financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States.'" Daou, 42 F.4th at 135 (quoting Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 78 (2d Cir. 2010)).

   Finding no error in Judge Moses' reasoning, Plaintiffs' objection is overruled.

**B.      Personal Jurisdiction**

Plaintiffs object to the R&R's recommendation that their claims against Bank Audi be dismissed for lack of personal jurisdiction.  (Pltf. Obj. (Dkt. No. 100) at 6)  Plaintiffs say that they "previously advanced a legal argument in favor of showing that Bank Audi is subject to specific jurisdiction[;] however[,] [P]laintiff[s'] argument ha[s] been disregarded by the magistrate [judge]."  Plaintiffs further assert that "Bank Audi is subject to [l]ong-[a]rm [j]urisdiction in New York and that exercising [personal] [j]urisdiction [over Bank Audi] [c]omports with [d]ue [p]rocess."  (Id.)  These arguments are conclusory and repeat arguments Plaintiffs made in their opposition brief.  (See Pltf. Opp. (Dkt. No. 84) at 10-15)  Accordingly, this objection will be reviewed for clear error.  See DiPilato, 662 F. Supp. 2d at 339.

While Plaintiffs allege that "Bank Audi regularly used New York correspondent accounts to move money to and from the United States," they have not shown that their claims against Bank Audi arise from the Bank's use of correspondent accounts in New York.  (R&R (Dkt. No. 94) at 21)  Advertising New York correspondent accounts and using the New York correspondent accounts to wire money to Plaintiffs in North Carolina is insufficient to establish personal jurisdiction here, because Plaintiffs' claims "turn on the measures that Bank Audi took 'in Lebanon to ensure that USD deposits remained in that country,' and the connection between the correspondent accounts and those claims is 'merely coincidental.'"  (Id. at 23 (citation omitted) (quoting Daou, 42 F.4th at 132))  Accordingly, Plaintiffs' objection is overruled.

*C.      Forum Non Conveniens*

As noted above, Plaintiffs complain that "most of [their] pleadings were disregarded by the magistrate [judge] because of a procedural error that could easily be corrected."  (Pltf. Obj. (Dkt. No. 100) at 2)  Plaintiffs contend that the arguments that Judge Moses disregarded are relevant to the forum non conveniens analysis:  "1) the argument that

Bank Audi had intentionally altered/forged the controlling 2018 Agreement by physically 'removing' certain marks, and 2) the fact that the Lebanese Judiciary was dysfunctional and therefore is not an available and adequate alternative." (Id. (emphasis omitted))

In arguing that (1) Bank Audi altered or forged the 2018 Agreement, and (2) the Lebanese judiciary is dysfunctional, Plaintiffs repeat arguments that they made in their original opposition to Defendants' motions to dismiss. (Compare Pltf. Obj. (Dkt. No. 100) at 2, with Pltf. Opp. (Dkt. No. 84) at 15-19, 33-37) Accordingly, those portions of the R&R addressing these arguments will be reviewed for clear error. See DiPilato, 662 F. Supp. 2d at 339. Plaintiffs' argument that Judge Moses improperly "disregarded" their pleadings will be considered de novo. See 28 U.S.C. § 636(b)(1)(C).

Plaintiffs' opposition to Defendants' motions to dismiss includes four declarations from Plaintiff George Elghossain, which amount to 72 pages. In the declarations, Plaintiffs refer to the declarations as "briefs," and each contains several paragraphs of legal argument. (See, e.g., Pltf. Resp. to Meouchy Decl. (Dkt. No. 81) ¶¶ 3, 53-80; Pltf. Resp. to Moghaizel Decl. (Dkt. No. 82) ¶¶ 3, 6-7, 18-48; Pltf. Resp. to Sader Decl. (Dkt. No. 83) ¶¶ 3, 4-22) In addition to these declarations, Plaintiffs filed a 48-page opposition brief. (See Pltf. Opp. (Dkt. No. 84))

In her scheduling orders, Judge Moses had directed "Plaintiffs [to] submit a single opposition brief to Defendants' pending motions of up to 50 pages." (See Aug. 11, 2022 Order (Dkt. No. 77); Sept. 9, 2022 Order (Dkt. No. 79)) Given that Plaintiffs filed an opposition brief of 48 pages, the legal arguments Plaintiffs set forth in their declarations caused them to exceed the page limit for briefing. For this reason, Judge Moses "disregard[ed] any legal arguments that are not set out in [P]laintiffs' opposition brief, and [relied] on [George] Elghossain's

supplemental declarations only to the extent they constitute admissible evidence of factual matters as to which he is competent to testify."  (R&R (Dkt. No. 94) at 3-4 n.2)

Although "pro se plaintiffs should be granted special leniency regarding procedural matters," LeSane v. Hall's Sec. Analyst, Inc., 239 F.3d 206, 209 (2d Cir. 2001), "[p]ro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" Azzarmi v. Key Food Stores Co-Operative Inc., No. 20 Civ. 6835 (GBD) (BCM), 2021 WL 1734922, at *3 (S.D.N.Y. May 3, 2021) (quoting Maisonet v. Metro. Hosp. & Health Hosp. Corp., 640 F. Supp. 2d 345, 348 (S.D.N.Y. 2009)).  Moreover, a court may disregard legal arguments improperly set forth in a declaration.  See, e.g., Perez v. Manna 2nd Ave. LLC, No. 15 Civ. 4655 (JCF), 2016 WL 7489040, at *4 (S.D.N.Y. Dec. 28, 2016) ("'[I]f a declaration improperly includes unsupported facts, legal arguments, or evidence that is not otherwise admissible, it may be stricken at the court's discretion.'" (quoting Degelman Indus., Ltd. v. Pro-Tech Welding and Fabrication, Inc., No. 06 Civ. 6346, 2011 WL 6754053, at *2 (W.D.N.Y. May 31, 2011))); Internet L. Libr., Inc. v. Southridge Cap. Mgmt., LLC, No. 01 Civ. 6600 (RLC), 2005 WL 3370542, at *3 (S.D.N.Y. Dec. 12, 2005), aff'd sub nom. ITIS Holdings Inc. v. Southridge Cap. Mgmt. LLC, 329 F. App'x 299 (2d Cir. 2009) (striking affidavit where it "is more akin to a memorandum of law than to an attorney's affidavit"); Black v. Buffalo Meat Serv., Inc., No. 15-CV-49S, 2021 WL 763723, at *4 (W.D.N.Y. Feb. 26, 2021) ("This Court is exercising its discretion and will disregard the repeated legal arguments contained in the Declaration and consider the arguments as raised in Plaintiff's Memorandum of Law.").  In sum, it was improper for Plaintiffs to insert legal argument in their declarations, and to the extent that Judge Moses disregarded legal arguments in Plaintiffs' declarations, she committed no error.

In any event, Judge Moses considered the substance of any legal arguments set forth in Plaintiffs' declarations, because Plaintiffs repeated in their opposition brief the same legal arguments found in their declarations.  (See R&R (Dkt. No. 94) at 7-8 n.6 (rejecting Plaintiffs' argument that Bank Audi forged the 2018 Agreement because "the text of the document is identical in both versions, . . . [P]laintiffs admit that they signed it," and "[c]ountersigning a contract after it has been fully executed by both customers is not forgery"); id. at 27 n.16 (rejecting Plaintiffs' argument that the Lebanese Judiciary was dysfunctional because "'bare denunciations and sweeping generalizations of corruption, rather than particularized allegations of targeted bias, do not permit us to pass value judgments on the adequacy of justice and the integrity of [Lebanon's] judicial system,'" and Plaintiffs "'failed to present facts indicating that they, specifically, would be victimized or unable to secure a fair hearing if required to litigate their claims against Lebanese financial institutions in Lebanon'" (alteration in original) (quoting Du Quenoy v. Am. Univ. of Beirut, 828 F. App'x 769, 772 (2d Cir. 2020) (summary order); Daou, 2021 WL 1338772, at *4))[6]  Accordingly, Plaintiffs' objection is overruled to the extent it is premised on an argument that Judge Moses improperly refused to consider Plaintiffs' declarations.

---

[6] Plaintiffs' arguments in their opposition brief mirror their arguments in their declarations. (See, e.g., Pltf. Opp. (Dkt. No. 84) at 33 ("Bank Audi intentionally and materially altered, falsified, mailed or emailed the forged 2018 Agreement and caused it to be filed in this Court with a clear intent to defraud and to alter Plaintiffs' legal rights and [D]efendant's obligations thus committing fraud upon this Court."); Pltf. Resp. to Meouchy Decl. (Dkt. No. 81) ¶¶ 103-07 (discussing "[t]he forged [2018] Agreement"); Pltf. Opp. (Dkt. No. 84) at 16 ("Bank Audi's forum selection clause should be deemed unenforceable due to the current crisis in Lebanon, and the documented mistreatment of United States litigants in Lebanon."); Pltf. Resp. to Moghaizel Decl. (Dkt. No. 82) ¶ 52 ("Plaintiffs strongly believe that Lebanese courts are neither available nor able and efficient especially when it comes to depositors."))

Plaintiffs also object to the R&R's recommendation that their claims be dismissed pursuant to the doctrine of <u>forum non conveniens</u>.  (Pltf. Obj. (Dkt. No. 100) at 6)  Plaintiffs contend that "Defendant Bank Audi ha[s] failed to satisfy [its] burden of establishing that an alternative adequate forum exists and the balance of the private and public interest factors weigh against the alternative forum."  (<u>Id.</u>)  They further argue that "[t]here are strong arguments distinguishing this case from <u>Daou</u> to show that there is New York jurisdiction," including that "[i]t is VERY inconvenient for [P]laintiffs to bring their lawsuit in Lebanon," and the doctrine of <u>forum non conveniens</u> "is about fairness to both parties."  (<u>Id.</u> at 7 (emphasis in original))  They provide a list of their "previous[] argu[ments] that venue in New York is [a]ppropriate and [n]ecessary."  (<u>Id.</u> (emphasis omitted))  Because this objection repeats arguments made in Plaintiffs' opposition papers (<u>see</u>, <u>e.g.</u>, Pltf. Opp. (Dkt. No. 84) at 15-25)), the relevant portions of the R&R will be reviewed for clear error.  <u>See</u> <u>DiPilato</u>, 662 F. Supp. 2d at 339.

Judge Moses correctly finds that (1) Plaintiffs – North Carolina residents – "identify no <u>bona fide</u> connection to New York, . . . make no claim that they chose this District for reasons of convenience," and could not properly contend that this District is the only forum where Defendants are amenable to suit (R&R (Dkt. No. 94) at 25); (2) "the Lebanese judicial system provides an adequate alternative forum" (<u>id.</u> at 26); and (3) New York has minimal interest in this litigation, while Lebanon has a significant interest in this dispute.  (<u>Id.</u> at 27)  Accordingly, Plaintiffs' objection will be overruled.

## **CONCLUSION**

For the reasons stated above, Judge Moses' R&R is adopted in its entirety, and Defendants' motions to dismiss are granted.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 64 and 67), and to close this case.

Dated:  New York, New York
        September 29, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge